Cheryl A. HARRIS, Co–Administratrix of the Estate of Ryan D. Maseth, deceased, and Douglas Maseth, Co–Administrator of the Estate of Ryan D. Maseth, deceased, Plaintiffs,

v.

KELLOGG, BROWN & ROOT SERVICES, INC., Defendant.

Civil Action No. 08–563.

United States District Court, W.D. Pennsylvania.

June 17, 2011.

Opinion Denying Reconsideration Sept. 23, 2011.

Patrick K. Cavanaugh, Stephen J. Del Sole, William S. Stickman, IV, Del Sole Cavanaugh, Pittsburgh, PA, for Plaintiffs.

Daniel L. Russell, Kurt J. Hamrock, Raymond B. Biagini, Shannon G. Konn, McKenna Long & Aldridge LLP, Washington, DC, Joseph L. Luciana, III, John R. Dingess, Kari M. Horner, Dingess, Foster, Luciana, Davidson & Chleboski LLP, William Wickard, K & L Gates LLP, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION

NORA BARRY FISCHER, District Judge.

### I. INTRODUCTION

In this Memorandum Opinion, the Court addresses the narrow question of whether Iraqi law should be applied to certain of Plaintiffs Cheryl Harris and Douglas Ma-seth's ("Plaintiffs") claims in this case, as requested by Defendant Kellogg, Brown & Root Services, Inc. ("KBR"). KBR's motion for the application of Iraqi law has been fully briefed and the Court has entertained oral argument from counsel. (Docket Nos. 215, 216, 218, 221, 229, 231). The parties have also supplied the Court with evidence of the potentially applicable Iraqi law; KBR has presented an expert report and a supplemental expert report describing Iraqi law under the Iraqi Civil Code while Plaintiffs have submitted Coalition Provisional Authority 17, an Order which governed United States–Iraqi relations for a period starting in late 2003 until 2008. (Docket Nos. 216–1, 218, 221–1). Upon consideration of the parties' submissions and arguments, KBR's motion to apply Iraqi law is DENIED.

### II. BACKGROUND

#### A. Brief Factual Summary

Plaintiffs Cheryl Harris and Doug Maseth are the parents of Staff Sergeant Ryan Maseth and administratrix and administrator, respectively, of his estate. (Docket No. 209). Both are domiciled in Pennsylvania. (Id. at ¶¶ 1–2). Staff Sergeant Maseth's estate is being administered in the state of Tennessee, where he had purchased a home shortly before commencing his second tour in Iraq. Defendant is a domiciliary of Texas, where its principal place of business is located, and Delaware, where it is incorporated. (Id. at ¶ 3). Plaintiffs allege that KBR's negligent conduct caused injuries to Staff Sergeant Maseth and his death in Iraq, resulting in damages. (Id. at ¶¶ 11–30). Plaintiffs also allege that KBR's negligent conduct caused them damages in Pennsylvania, including that:

b. They have been denied and have forever lost the services, assistance,

guidance, counseling, companionship, and society of SSG Maseth;

c. They have been and will forever be deprived of the financial support and pecuniary benefits which they would have received from SSG Maseth;

(*Id.* at ¶ 31).

At the time of his death, Staff Sergeant Maseth was serving his second tour in Iraq as an "active duty Army Ranger and Green Beret, serving in the 5th Special Forces Group (Airborne) of the United States Army." (*Id.* at ¶ 6). Staff Sergeant Maseth was housed at a building known as LSF–B1. (*Id.* at ¶ 11). KBR provided operations and maintenance services to the RPC and LSF–B1 pursuant to the LOGCAP III contract with the United States Army. (*Id.* at ¶¶ 8–10).

The parties do not dispute that, on January 2, 2008, Staff Sergeant Maseth was electrocuted while showering in his living quarters in building LSF–B1 at the RPC. *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F.Supp.2d 400, 414 (W.D.Pa. 2009). Staff Sergeant Maseth's exposure to electric current caused him to suffer cardiac arrest, which resulted in his death. *Id.* The source of the electric current was determined to be a water pump located on the roof of LSF–B1. *Id.* at 414–15.

Plaintiffs allege that KBR's negligence in performing its operations and mainte-nance services, particularly, its negligent performance or non-performance of elec-trical maintenance services at LSF–B1, in-cluding same as to the malfunctioning wa-ter pump, was the proximate cause of Staff Sergeant Maseth's death. (Docket No. 209 at ¶¶ 11–30). Plaintiffs' claims sound in negligence and are brought under Penn-sylvania's wrongful death and survival statutes. (*Id.* at ¶¶ 32–39). KBR argues that it is not liable to Staff Sergeant Ma-seth's estate and contends, among other things, that its responsibilities to perform electrical maintenance at the base were limited under the LOGCAP III contract and relevant Task Orders. (Docket No. 217).

### B. Relevant Iraqi Law

#### 1. Iraqi Civil Code

In his expert report, Professor Haider Ala Hamoudi[1] from the University of Pittsburgh School of Law summarizes Ira-qi law as set forth in its Civil Code. (Dock-et No. 216–1). Plaintiffs do not contest his summary of the law set forth in the rele-vant Iraqi Civil Code sections.[2] (*See* Docket No. 218). The Court now turns to his summation.

If applicable, Professor Hamoudi posits that Plaintiffs' common law tort claims would arise under the Iraqi Civil Code articles governing "wrongful actions."

---

**1.** Professor Hamoudi holds a J.D. and doctor-ate from the Columbia University School of Law. (Docket No. 216–1 at ¶ 4). He is pres-ently an assistant professor of law at the Uni-versity of Pittsburgh School of Law, a position he has held since 2007. (*Id.* at ¶ 1). Profes-sor Hamoudi previously held an associate professorship position at Columbia University School of Law starting in 2005. (*Id.* at ¶ 3). He also worked for two years (from 2003–2005) in Iraqi law schools. (*Id.*). In 2009, he advised a committee which was tasked by the Iraqi legislature with drafting amendments to the Iraqi constitution. (*Id.* at ¶ 2). Professor Hamoudi has conducted significant research

regarding Middle Eastern law, including Iraqi and Islamic law and published numerous arti-cles regarding same. (*Id.* at ¶ 4). Plaintiffs have not contested that Professor Hamoudi is properly qualified as an expert in Iraqi law.

**2.** As discussed *infra*, Plaintiffs do challenge whether the proffered provisions of the Iraqi Civil Code should be applied in this case. They argue that Order 17 governs this case, which dictates that the laws of the United States of America, or the interested states, should apply.

(Docket No. 216–1 at ¶¶ 17–19). Article 202 provides that "harmful acts to the person, including killing, wounding, assault or any other type of infliction of injury, may entitle the victim to compensation." (*Id.* at ¶ 19). "Article 203 indicates that in the case of killing, or in the case of death by reason of wounds or any other harmful act, the perpetrator may be responsible for compensating those who 'have become impoverished and have been deprived of sustenance because of the killing or death.'" (*Id.*). "Article 204 is then the catch-all provision, indicating that 'any transgression that results in the injury of another beyond that which was mentioned in the previous Articles is covered by compensation.'" (*Id.*). Three elements must be established to recover under Articles 202, 203 or 204: (1) fault, i.e., intentional conduct or negligence by the actor; (2) harm, including material harm, i.e., a realized loss of a financial interest by the victim and moral harm, i.e., harm to reputation or honor, emotional distress or pain and suffering damages; and (3) causation between the fault and the harm suffered. (*Id.* at ¶ 20).

Professor Hamoudi highlights the limitations of "causation" under the Iraqi Code. He quotes Article 211, as follows:

If a person determines that harm arises from a foreign cause which he had no hand in, like an act of heaven, an event of surprise, *force majeure*, the act of another, or the fault of the victim, then he is not liable if there is no agreement to the contrary concerning this.

(*Id.* at ¶ 35). Under Iraqi law, joint and several liability may apply to harm caused by multiple actors, subject to exceptions. (*Id.*). As described by Professor Hamoudi, "one party is released from liability to the extent that the harm caused by the wrongful act of another, whether subsequent or precedent, 'drowns out' the first party's wrongful act." (*Id.* at ¶ 36). Under the "drowning out" exception, an intentional act will "drown out" the negligent act and the negligent party will not be held responsible. Also, a negligent party will not be responsible if "one of the causes is the result of the other" or, stated differently, "where there are two negligent acts, one built upon and the product of another, the second negligent act is 'drowned out' by the first, and is no longer considered a cause of harm." (*Id.* at ¶¶ 38–40).

Article 205(2)-(3) provides that:

(2) The wife and the family relatives have the right to compensation for the moral harm inflicted upon them by virtue of the death of the victim.

(3) Compensation for moral harm does not extend to anyone else except when the amount has been established by agreement or by judicial ruling.

(*Id.* at ¶ 41). According to Professor Hamoudi, leading commentators agree that these sections "preclude the possibility of moral harm recovery on the part of a decedent victim as opposed to his family members." (*Id.* at ¶ 42). In addition, "compensation for material harm that has befallen a decedent victim, such as hospital or funeral expenses, is recoverable under Iraqi law, but compensation for moral harm such as pain and suffering or emotional distress *on the part of the decedent* (as opposed to his family members), is not." (*Id.* at ¶ 44). Under Iraqi law, the decedent's claim for moral harm remains inchoate at the time of his death and the right to recovery cannot be transferred to another person unless it is first determined by agreement or final judicial ruling. (*Id.* at ¶ 42). Among the reasons for this legal principle is that there are no estates under Iraqi law and the intestacy rules permit only a dividing of property amongst one's heirs at the time of his death. (*Id.*).

Professor Hamoudi also submits that there is no provision in the Iraqi Civil Code which authorizes an award of punitive damages. Instead, Article 207 of the Civil Code provides that:

(1) The court shall measure the compensation in all instances to the amount that represents the harm suffered by the victim and what he has lost in earnings, provided that this is a natural result of the wrongful act.

(2) Taken into account in the measurement is the prevention from the benefits of things and may include guarantees of wages.

Under Iraqi law, "the purpose of a civil trial cannot involve punishment or deterrence in any form." (*Id.* at ¶ 50). Thus, he opines, consistent with leading commentators on Iraqi law, that compensation available under the Iraqi Civil system is solely for harm suffered and punitive damages are unavailable. (*Id.* at ¶ 49). The reasons for this rule are that punishment for a wrong is "solely within the ambit of the Penal Code and the criminal courts responsible for interpreting and applying it," while the civil system is meant to compensate victims, only. (*Id.* at ¶ 56). This policy is furthered by a number of procedural rules which essentially stay a civil proceeding in the wake of a criminal case arising out of the same facts. (*Id.*). Moreover, if there is a finding of guilt, that finding remains binding in the civil courts. (*Id.*).

### 2. Coalition Provisional Authority Order Number 17

Following the American invasion of Iraq in March of 2003, a Coalition Provisional Authority was placed in power to govern the country. On June 28, 2004, sovereignty was transferred to the Iraqi Interim Government, and on January 30, 2005, the same date elections were held to choose representatives for the newly formed Iraqi National Assembly, power was transferred to the Iraqi Transitional Government. On April 7, 2005, the Assembly chose Jalal Talabani as President of State. The Constitution of Iraq was ratified on October 15, 2005, and the permanent Iraqi government was installed on May 20, 2006. Yet throughout these incremental changes in power from Saddam's Ba'athist regime to the current government, Iraq has maintained its status as a state, or nation. Its territorial integrity is intact, and those who were citizens of Iraq before the 2003 invasion are still citizens of Iraq. There has been no discontinuity of statehood.

*Kalasho v. Republic of Iraq,* 2007 WL 2683553, at *6 (E.D.Mich., Sept. 7, 2007).

Coalition Provisional Authority Order Number 17 ("Order 17") "was issued by Paul Bremer, the head of the Coalition Provisional Authority, during the early days of the U.S. occupation of Iraq." *Galustian v. Peter,* 591 F.3d 724, 728 (4th Cir.2010). A revised Order 17 was later issued and the terms of Order 17 remained in place after the transfer of sovereignty to the Iraqis in 2004. *Id.* Pertinent here, section 4.2 of Order 17 provides that:

*Contractors shall not be subject to Iraqi laws or regulations in matters relating to the terms and conditions of their Contracts,* including licensing and registering employees, businesses and corporations; provided, however, Contractors shall comply with such applicable licensing and registration laws and regulations if engaging in business or transactions in Iraq other than Contracts. Notwithstanding any provisions in this Order, Private Security Companies and their employees operating in Iraq must comply with all CPA Orders, Regulations, Memoranda, and any im-

plementing instructions or regulations governing the existence and activities of Private Security Companies in Iraq, including registration and licensing of weapons and firearms.

(Docket No. 218–2 at § 4.2) (emphasis added). In addition, section 4.3 of Order 17 states:

> **Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto** Nothing in this provision shall prohibit MNF Personnel from preventing acts of serious misconduct by Contractors, or otherwise temporarily detaining any Contractors who pose a risk of injury to themselves or others, pending expeditious turnover to the appropriate authorities of the Sending State. In all such circumstances, the appropriate senior representative of the Contractor's Sending State in Iraq shall be notified.

(*Id.* at § 4.3) (emphasis added). Finally, Section 18 provides that:

> Except where immunity has been waived in accordance with Section 5 of this Order, **third-party claims including those** for property loss or damage and **for personal injury, illness or death** or in respect of any other matter **arising from or attributed to acts or omissions of** CPA, MNF and Foreign Liaison Mission Personnel, International Consultants, and **Contractors or any persons employed by them for activities relating to performance of their Contracts, whether normally resident in Iraq or not and that do not arise in connection with military operations, shall be submitted and dealt with by the Sending State whose personnel (including the Contractors engaged by that State), property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the Sending State's laws, regulations and procedures.**

(Docket No. 218–2 at § 18) (emphases added).

The United Nations Security Counsel Resolution 1790, which gives legal effect to Order 17 immunity, expired on December 31, 2008. Effective January 1, 2009, the Status of Forces Agreement ("SOFA") now provides that "Iraq shall have the primary right to exercise jurisdiction over United States contractors and United States contractor employees."

*Galustian v. Peter,* 750 F.Supp.2d 670, 678, n. 17 (E.D.Va.2010) (quoting SOFA Art. 12, § 2).

### 3. *Professor Hamoudi's Summation of Order 17*

Although he did not address Order 17 in his initial expert report, Professor Hamoudi admits in his supplemental report that "Iraqi practitioners and legal academics all concede that CPA Orders are a valid part of Iraqi law unless repealed." (Docket No. 220–1 at ¶ 2). However, he claims that CPA Orders are "often ignored" by Iraqi courts because these provisions were drafted by "non-Iraqi lawyers with little or no knowledge of the Iraqi legal system." (*Id.*). Professor Hamoudi opines that the language of sections 4.2 and 4.3 of Order 17 suggests that these provisions were not drafted in a manner consistent with Iraqi law under its Civil Code. (*Id.* at ¶¶ 3–5). He posits that sections 4.2 and 4.3 of Order 17 apply different legal standards: under section 4.2, Iraqi law may not apply to "matters relating to terms and conditions of a contract"; and, pursuant to section 4.3, "Contractors are immune from Iraqi legal process." (*Id.* at ¶¶ 6–7). Professor Hamoudi makes no reference to section 18 of Order 17 in his Supplemental Expert

Report. (*See* Docket No. 220–1). Thus, he has not offered the Court any opinion regarding the proper interpretation of section 18.

### C. Relevant Procedure

On March 31, 2009, this Court denied KBR's motion to dismiss Plaintiffs' claims relying on the political question doctrine and combatant activities exception to the Federal Tort Claims Act, without prejudice. *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F.Supp.2d 400, 434 (W.D.Pa.2009). This Court later denied KBR's motion requesting that the Court certify the legal questions presented by these defenses and to authorize the filing of an interlocutory appeal. *Harris*, 2009 WL 1248060 (W.D.Pa. Apr. 30, 2009). Despite the denial of an interlocutory appeal, KBR appealed the Court's March 31, 2009 ruling to the United States Court of Appeals for the Third Circuit on April 30, 2009. (Docket No. 166). The Court of Appeals dismissed KBR's appeal and remanded the case for further proceedings. *Harris*, 618 F.3d 398 (3d Cir.2010).

On remand, KBR attempted to limit discovery to the defenses it raised in its earlier motion to dismiss, but the Court ordered the parties to commence discovery as to Plaintiffs' claims and KBR's defenses. *Harris*, 2010 WL 4614694 (W.D.Pa. Nov. 5, 2010). However, the Court permitted KBR to bring the present motion while discovery was ongoing. (Docket No. 198).

KBR filed its motion for the application of Iraqi law, brief in support and expert declaration on February 4, 2011. (Docket Nos. 215, 216). Plaintiffs responded by filing a brief in opposition and exhibits on February 21, 2011. (Docket No. 218). After receiving leave of court, KBR filed its reply brief and a supplemental expert declaration on March 10, 2011. (Docket No.

221). The Court heard oral argument from counsel during a motion hearing on April 5, 2011. Subsequent to the argument, the parties submitted supplemental briefing; KBR filed its supplemental brief on April 27, 2011 while Plaintiffs filed their supplemental brief on May 5, 2011. (Docket Nos. 229, 231). Because the Court has heard oral argument and reviewed all of the parties' submissions, KBR's motion is now ripe for disposition.

## III. DISCUSSION

### A. Rule 44.1 Analysis

 In its motion for the application of Iraqi law, KBR has requested that this Court apply the laws of a foreign country to Plaintiffs' claims in his case. (Docket Nos. 215, 216). To this end, Rule 44.1 of the Federal Rules of Civil Procedure provides that:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Fed.R.Civ.P. 44.1. "The parties ... generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case." *Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440 (3d Cir.1999). "Where parties fail to satisfy either burden the court will ordinarily apply the forum's law." *Id.* at 441. Thus, Rule 44.1 imposes no obligation on this Court to determine foreign law on its own accord, but this Court also possesses "broad authority to conduct [its] own inde-

pendent research to determine foreign law." *Id.* at 440. Here, KBR asserts that Iraqi law should be applied and, thus, bears the burden to supply the Court with appropriate Iraqi law, and to persuade the Court that it governs this case.

■ The threshold issue raised by the parties is whether the provisions of the Iraqi Civil Code are potentially applicable to this case as KBR suggests or if Plaintiffs' view that Order 17 supplants the provisions of the Iraqi Civil Code in favor of the laws of the United States of America or one of its States should be adopted. (Docket Nos. 216, 218, 221). As discussed above, KBR has supplied the Court with an expert report from Professor Hamoudi summarizing the potentially relevant provisions of the Iraqi Civil Code. (Docket No. 216–1). Plaintiffs do not quarrel with his summary; instead, they argue that the provisions of Order 17 should govern. Specifically, section 18 of Order 17 provides that:

> Except where immunity has been waived in accordance with Section 5 of this Order, ***third-party claims including those*** for property loss or damage and ***for personal injury, illness or death*** or in respect of any other matter ***arising from or attributed to acts or omissions of*** CPA, MNF and Foreign Liaison Mission Personnel, International Consultants, and ***Contractors or any persons employed by them for activities relating to performance of their Contracts, whether normally resident in Iraq or not and that do not arise in connection with military operations, shall be submitted and dealt with by the Sending State whose personnel (including the Contractors engaged by that State), property, activities or other assets are alleged to have caused the claimed damage, in a manner consistent with the Sending State's laws, regulations and procedures.***

(Docket No. 218–2 at § 18) (emphases added). They also point to sections 4.2 and 4.3 of Order 17 for further support of their position.

Professor Hamoudi's initial report made no reference to Order 17. (*See* Docket No. 216–1). However, in his supplemental report, he admitted that Order 17 was a "valid part of Iraqi law unless repealed" and that the CPA was not repealed until November 17, 2008, eleven months after Staff Sergeant Maseth's death, which is the subject of this lawsuit. (Docket No. 220–1 at ¶¶ 1, 8). He further acknowledged that section 4.2 provides that government contractors are not subject to Iraqi laws regarding the terms and conditions of their contracts and that government contractors are immune from Iraqi legal process pursuant to section 4.3. (*Id.*). Therefore, despite the apparent consensus that Order 17 was incorporated into Iraqi law and applied to government contractors, Defendant's Iraqi law expert only addressed same in response to the Plaintiffs' arguments. In addition, Professor Hamoudi's supplemental expert report ignores section 18, despite the fact that Plaintiffs relied on that section in their opposition. (*See* Docket Nos. 220–1; 218). Hence, the Court questions the credibility of the defense expert, given the lack of any reference to Order 17 in his initial report and the lack of completeness in his supplemental report. *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 268 (3d Cir.2000) (holding that under Rule 44.1 "the District Court is in the best position to determine what at this point is essentially a credibility issue—i.e., which expert to believe.").

As Professor Hamoudi did not address section 18, the Court is left with only legal argument from the parties regarding the proper interpretation of that provision.

While they each cite a number of cases which have tangentially addressed the applicability of Order 17 and/or Iraqi law to tort cases brought against government contractors, none of them are binding on this Court and none contain any analysis of section 18. The decision relied upon by Plaintiffs, *Dalkilic v. Titan Corp.*, 516 F.Supp.2d 1177, 1192 (S.D.Cal.2007), merely noted that the parties in that case and their experts agreed that California law applied because Order 17 immunity dictated such a result. On the other hand, the decisions advanced by KBR which have mentioned that Iraqi law may apply or held that Iraqi law applied to the case before it, *Baragona v. Kuwait Gulf Link Transport Co.*, 691 F.Supp.2d 1346 (N.D.Ga.2007), *vacated on other grounds,* 691 F.Supp.2d 1351 (N.D.Ga.2009) and *Al Quraishi v. Nakhla,* 728 F.Supp.2d 702 (D.Md.2010), are distinguishable because those courts were not located in Pennsylvania and did not apply Pennsylvania's choice of law rules. Those jurisdictions, Maryland and Georgia, apply the principle of *lex loci delicti* or the law of the place of the wrong. *Baragona,* 691 F.Supp.2d 1346; *Al–Quraishi,* 728 F.Supp.2d at 702. As Plaintiffs point out, and as discussed below, Pennsylvania no longer strictly adheres to this legal principle.[3] In addition, the majority decision in *Saleh v. Titan Corp.,* 580 F.3d 1 (D.C.Cir.2009) cannot reasonably be read to suggest anything more than the Court of Appeals commented that Iraqi tort law may apply to the facts in that case. In fact, Circuit Judge Garland noted in his dissent that the issue of the application of Iraqi law was not raised before the district court and that the holding of the majority was overbroad and did not contemplate the interests that states connected to that litigation could have in applying generally applicable tort law to the case. *Saleh,* 580 F.3d at 30–31, n. 20, 22.

Aside from these decisions, KBR's primary argument against the application of Order 17 is that KBR's services provided to the Army in Iraq "arise in connection with military operations" and, thus, section 18 of Order 17 does not apply. This Court rejects such a broad interpretation of section 18, which ignores the preceding clause of the provision. *See Abbott v. Abbott,* —— U.S. ——, 130 S.Ct. 1983, 1990, 176 L.Ed.2d 789 (2010) (quoting *Medellín v. Texas,* 552 U.S. 491, 506, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008)) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). Again, section 18 provides that the sending state's laws apply to third party personal injury claims, including those resulting in death, from acts or omissions of the Contractor "for activities relating to performance of their Contracts ... and that do not arise in connection with military operations." CPA Order 17, § 18. The reason for the enactment of Order 17 was to provide some governance of the Coalition Provisional Authority, a transitional government put in place after the United States' invasion of Iraq and continued military operation there. *Kalasho,* 2007 WL 2683553, at *6. The Contracts entered into with government contractors referenced in this Order (which would include the LOGCAP III Contract under which KBR operated in Iraq) all necessarily supported this mission. Considering this background, the adoption of KBR's interpretation, i.e., that the instant case "arises in connection with military operations" because its contract supported the military base, would encompass virtually all claims, rendering the language concerning "for activities relating to performance of their Contracts" under sec-

---

**3.** *See* § III.B.2, *infra.*

tion 18 superfluous.[4] *See Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 458 (D.N.J.1999) ("It is a cardinal principle of construction that courts shall interpret contracts, including treaties, so as to give meaning to each provision rather than rendering some provisions, or portions thereof, superfluous.") (citing *Sullivan v. Kidd,* 254 U.S. 433, 439, 41 S.Ct. 158, 65 L.Ed. 344 (1921) ("all parts of a treaty are to receive a reasonable construction, with a view to giving a fair operation to the whole."); *De Geofroy v. Riggs,* 133 U.S. 258, 270, 10 S.Ct. 295, 33 L.Ed. 642 (1890) ("It is a rule, in construing treaties as well as laws, to give a sensible meaning to all their provisions, if that be practicable.")).

In sum, given KBR's admissions, through Hamoudi, that Order 17 precluded claims against contractors related to their contracts under Iraqi law, and that contractors were immune from suit in Iraqi courts, as well as the Court's interpretation of section 18 of Order 17, KBR has failed to meet its burden to persuade this Court that the recited portions of the Iraqi Civil Code possibly govern this litigation. Accordingly, KBR's motion for the application of Iraqi law is denied. Thus, the law of the forum must apply. *Bel–Ray Co., Inc.*, 181 F.3d at 441.

### B. Choice of Law Analysis

Notwithstanding that the Court has concluded that KBR has failed to meet its burden under Rule 44.1, and KBR's motion fails on this basis alone, the Court will continue with its analysis of the remainder of the parties' arguments. In so doing, the Court must first determine whether the instant matter is controlled by the federal statute relied upon by KBR, 16 U.S.C. § 457 or Pennsylvania choice of law rules, as are generally applied in choice of law disputes by a district court sitting in Pennsylvania. *See Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 224–225 (3d Cir. 1991) (analyzing whether a federal law, the Fair Labor Standards Act, or common law choice of law standards governed dispute).

### 1. Applicability of 16 U.S.C. § 457

KBR argues, in part, that the Court should apply Iraqi law to Plaintiffs' claims in this case based on its interpretation of the doctrine of federal enclave jurisdiction as codified at 16 U.S.C. § 457. (Docket No. 229). KBR reasons that section 457 requires courts to apply the law of the surrounding state in negligence or wrongful death cases which occur within a place

---

4. The Court notes that this interpretation is consistent with the Court's prior ruling denying KBR's initial motion to dismiss relying on the combatant activities exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j). To this end, the Court previously held that:

> [t]his case does not involve claims arising from active military combat operations. The issues presented by Plaintiffs' claims involve the alleged negligent performance or non-performance of KBR in providing maintenance services to the United States Army. In addition, KBR has not presented the Court with any evidence or allegations that Staff Sergeant Maseth's death was caused by active military operations. Therefore, Plaintiffs' claims do not arise out of "the combatant activities of the military" under 28 U.S.C. § 2680(j).

*Harris,* 618 F.Supp.2d at 434. The Court understands that recently the district court in *Aiello v. Kellogg, Brown & Root Services, Inc.*, 751 F.Supp.2d 698, 712–15 (S.D.N.Y.2011), disagreed with this Court's analysis. Although KBR contends that this Court should revisit its earlier holding at this time, the Court has repeatedly held that its prior arguments were dismissed without prejudice, and may be raised again, at the close of discovery. *See Harris,* 2010 WL 4614694 (W.D.Pa. Nov. 5, 2010). And, despite the decision in *Aiello,* which is non-binding, the caselaw surrounding tort law claims against government contractors supporting military operations overseas remains unsettled.

subject to the exclusive jurisdiction of the United States. (*Id.*). KBR maintains that the United States had exclusive control of the military base where the alleged negligent activities occurred and because the base was located within Iraq, section 457 dictates that Iraqi law should apply. (*Id.*). Plaintiffs disagree, arguing that "State" as used in the statute is limited to one of the 50 United States rather than a foreign country such as Iraq. (Docket No. 231).

The Court turns to section 457, which provides that:

> In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

16 U.S.C. § 457. The term "State" is undefined in the statute. However, the legislative history provided by the parties indicates that "State" refers to one of the 50 States in the Union. (*See* Docket No. 229–3).[5] This interpretation is consistent with the Constitution, which refers to the "States" in a similar capitalized fashion throughout. *See e.g.*, U.S. Const. art. IV, § 1, sect 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State"); U.S. Const. art. IV, § 2, cl. 1 ("The Citizens of each State shall be entitled to all Privileges and Immunities in the several States."); U.S. Const. art. IV, § 3, cl. 1 ("New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress."). In addition, courts have strictly construed the term "State" under section 457, reasoning that the District of Columbia is not a "State" under section 457. *See Watson v. Manhattan and Bronx Surface Transit Operating Authority*, 487 F.Supp. 1273, 1276 (D.N.J.1980).[6]

---

5. Specifically, in support of the bill, Senator Robinson explains that:

 Practically every state now has given a right of action to the legal representative of the dependent relatives of one who has suffered a death by reason of the neglect or wrongful act of another, there being no such recovery, it will be recalled, at common law.

 There are a great many places in the United States under the exclusive jurisdiction of the United States—the national parks, for instance. If a death should occur within those places, within the exclusive jurisdiction of the United States, there would be no right of recovery on the part of the representatives or dependents of the person who thus suffered death as a result of the wrongful act or neglect of another.
 (Docket No. 229–3).

6. In so holding, the *Watson* court noted that "the District of Columbia is the 'seat of government', over which the Congress exercises exclusive jurisdiction by virtue of U.S. Const. art. I, sec. 8, cl. 17." *Watson*, 487 F.Supp. at 1276. KBR relies upon *Kelly v. Lockheed Martin Services Group*, 25 F.Supp.2d 1 (D.P.R.1998) in support of its position that "State" has broader implications. *Kelly* recognized that a specific area of Puerto Rico was a "federal enclave" because, among other things, the United States had purchased the land wherein the tort occurred directly from Puerto Rico. The *Kelly* court, however, did not address the question of whether Puerto Rico was a "State" under section 457. *Id.* Of course, the Commonwealth of Puerto Rico is not a state; it is a United States territory. *See Igartua v. United States*, 626 F.3d 592 (1st Cir.2010). The distinction between the two

In light of the foregoing, the Court concludes that "State" as used in 16 U.S.C. § 457 does not refer to a nation-state or foreign country such as Iraq. Therefore, section 457 is not controlling. Accordingly, KBR's motion for the application of Iraqi law is denied to the extent that it relies on said statute.[7]

### 2. *Pennsylvania Choice of Law Rules*

Having concluded that section 457 does not govern, the Court must turn to a traditional choice of law analysis. In determining which jurisdiction's laws to apply to Plaintiffs' wrongful death and survival claims, this Court applies Pennsylvania's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the past, Pennsylvania adhered to the principle of *lex loci delicti*, and applied the law of the place of the wrong in tort cases. *See Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (Pa.1964). However, Pennsylvania has long since abandoned this approach. *Id.* Instead, Pennsylvania conflicts law has combined a "governmental interest analysis" with the Restatement (Second) of Conflicts theory, thereby adopting a "hybrid" approach. *Hammers-mith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir.2007) (citing *Melville v. American Home Assur. Co.*, 584 F.2d 1306 (3d Cir. 1978) and *Griffith*, 416 Pa. 1, 203 A.2d 796).

■ This approach requires the Court to first determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply, i.e., whether there is a conflict. *Hammersmith*, 480 F.3d at 230. If their respective laws are the same, there is no conflict at all and the choice of law analysis ends; the law of the forum, Pennsylvania law here, would apply. *Id.* If the laws differ, the Court must examine the policies underlying the law of each jurisdiction and determine whether the conflict is "true," "false," or "unprovided for." *Id.*

■ "A true conflict exists when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied." *Budget Rent–A–Car Sys. v. Chappell*, 407 F.3d 166, 170 (3d Cir.2005) (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 & n. 15 (3d Cir.1991)). If a true conflict exists, the Court must then determine which state has the "greater interest in the application

cases, i.e., why the District of Columbia is not considered a "State" but Puerto Rico is, is not central to this Court's holding and need not be resolved here. It is enough that Iraq is a foreign country and KBR has offered this Court no authority supporting its position that section 457 applies to a military base located in a foreign country. *See also* n. 7, *infra.*

7. The parties also debate whether the military base in Iraq is a "federal enclave", subject to the exclusive jurisdiction of the United States. The term "federal enclave" originates in the enclave clause in the Constitution. *See* U.S. Const. art. I, § 8, cl. 17 ("To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings"). Although the decisions in this area are limited, courts have reasoned that the enclave clause does not apply to a military installation on foreign soil. *See Gavrilovic v. Worldwide Language Resources, Inc.*, 441 F.Supp.2d 163, 177 (D.Me.2006) (defamation claim from email originating at military base in Afghanistan); *Nguyen v. Allied Signal, Inc.*, No. C98–03616, 1998 WL 690854, at *1 (N.D.Cal. Sept. 29, 1998) (rejecting defendant's argument that federal enclave doctrine jurisdiction precluded state tort claims arising from plaintiff's exposure to asbestos on military base in Vietnam).

of its law." *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 856 (1970).

■■■ A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law. *Budget Rent–A–Car,* 407 F.3d at 170. When there is a false conflict, the court must apply the law of the only interested jurisdiction. *Id.* If no jurisdiction's interests would be impaired if its laws were not applied, there is an "unprovided for" conflict and *lex loci delicti* (the law of the place of the wrong) continues to govern. *Budget Rent–A–Car Sys.,* 407 F.3d at 170 (citing *Miller v. Gay,* 323 Pa.Super. 466, 470 A.2d 1353 (1983)).

> [T]he factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

> The relevant contacts for a tort are enumerated in Restatement (Second) of Conflict of Laws § 145(2)(a)-(d), and include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."

*Taylor v. Mooney Aircraft Corp.,* 265 Fed. Appx. 87, 91 (3d Cir.2008).

Our Court of Appeals has reasoned that Pennsylvania choice of law analysis "employs depecage,[8] the principle whereby different states' laws may apply to different issues in a single case." *Taylor,* 265 Fed. Appx. at 91 (citing *Berg Chilling Systems, Inc. v. Hull Corp.,* 435 F.3d 455, 462 (3d Cir.2006); *Broome v. Antlers' Hunting Club,* 595 F.2d 921, 924 (3d Cir.1979)). Therefore, the Court must separately analyze the law of the potentially interested jurisdictions (i.e., Iraq, Pennsylvania, Tennessee and Texas) regarding each of the disputed legal issues. Those disputed legal issues are: (1) principles of causation; (2) the availability of damages for pain and suffering; and, (3) the availability of punitive damages. The Court will analyze the applicable principles, in turn.

#### a. *Liability—Causation*

#### i. Actual Conflict of Laws

■■■ There is an actual conflict of laws between the laws of Iraq, Pennsylvania, Tennessee and Texas as to causation and, more specifically, whether a second negligent actor may be liable if the negligence caused by the first actor would have caused the harm to the plaintiff without the second negligent act.

Under Iraqi law, a second negligent party will not be held responsible if "one of the causes is the result of the other" or, stated differently, "where there are two negligent acts, one built upon and the product of another, the second negligent act is 'drowned out' by the first, and is no longer considered a cause of harm." (*Id.* at ¶¶ 38–40). In his reports, Professor Hamoudi does not provide a precise opin-

---

**8.** "A French word, depecage (DE–PA–SAJ) is defined as a 'cutting up, dismembering, carving up.'" *Taylor,* 265 Fed.Appx. at 92, n. 5

(quoting *Kelly v. Ford Motor Co.,* 942 F.Supp. 1044, 1045 n. 2 (E.D.Pa.1996) (citation omitted)).

ion as to the policy underlying this principle of law. (*See* Docket No. 216–1). However, the logical reason for such a policy is to protect the second actor from liability where the harm to the plaintiff would have occurred without any action (or, presumably, inaction) by the second actor.[9] Assuming this is the stated policy reason for the law; Iraqi law protects subsequent defendants from being subject to damages in such situations but also places the full burden to compensate the plaintiff for the harm caused on the initial negligent actor.

 Under Pennsylvania law, a defendant is liable if his negligent conduct was a "factual cause" of the harm to the plaintiff. Pa. SSJI (Civ), § 3.15. "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." *Id.* However, "[t]o be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as [his or her] own negligence is a factual cause of the injury." *Id.* In addition,

> [w]here the negligent conduct of a defendant combines with other circumstances and other forces to cause the harm suffered by the plaintiff, the defendant is responsible for the harm if [his or her] negligent conduct was a factual cause of the harm, even if the harm would have occurred without it.

Pa. SSJI (Civ), § 3.17. The explanatory comments note that "[a] defendant cannot escape liability where his or her negligent conduct would have brought about the harm by itself simply because another force coincidentally would also have brought about the harm if acting alone." *Id.*

Pennsylvania law also employs a comparative negligence regime whereby a plaintiff is not barred from recovery based on his or her own contributory negligence "where such negligence is not greater than the causal negligence of the defendant or defendants against whom recovery is sought." 42 Pa.C.S. § 7102(a). If multiple defendants are found liable for the harm caused to the plaintiff, they are each held responsible for damages to the extent of their proportional responsibility for the harm caused to the plaintiff. 42 Pa.C.S. § 7102(b). However, they remain jointly and severally liable for the full amount of damages owed to the plaintiff. *Id.* Under this scheme, "[t]he plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery." *Id.* But, "[a]ny defendant who is so compelled to pay more than his percentage may seek contribution" from any other defendants, up to their proportionate amount of the damages. *Id.* The policies underlying Pennsylvania's scheme both as to causation and damages protect plaintiffs to greater ensure that they will receive full recovery of their damages for harm suffered.

 "Under Texas law, if a plaintiff has evidence that a defendant's negligence is a proximate cause of an accident, the plaintiff need not make any attempt to rule out other proximate causes of the accident because '[t]here can be more than one

---

9. The Court notes that KBR's failure to provide the Court with any evidence of the policies underlying this aspect of Iraqi law further demonstrates that it has not met its burden to prove Iraqi law under Rule 44.1. *See* § III.A., *supra.*

proximate cause of an injury, and all persons whose negligent conduct contributed to the injury are responsible for it.'" *Michaels v. Avitech, Inc.*, 202 F.3d 746, 753 (5th Cir.2000) (quoting *Coleman v. Equitable Real Estate Investment Management, Inc.*, 971 S.W.2d 611 (Tex.App.-Dallas 1998)).

Texas law also has a system of proportionate responsibility under which "a claimant may not recover damages if his percentage of responsibility is greater than 50 percent," but, if the claimant's responsibility is 50 percent or less, the trier of fact is tasked with determining the percentage of responsibility for the harm among the relevant parties. Tx.Civ.Prac. & Rem. Code §§ 33.001, 33.003. Each defendant is liable only for the percentage of damages equal to the defendant's percentage of responsibility as found by the trier of fact, except that a defendant who is found responsible for greater than 50 percent of the harm is held jointly and severally liable with the other responsible defendants. *Id.* at § 33.013. However, if this defendant pays a judgment in excess of its percentage of responsibility, it can assert a claim for contribution against the other responsible party. *Id.* Like Pennsylvania's causation's laws, Texas law protects plaintiffs to ensure that all individuals responsible for negligent conduct are liable for same and also ensures that plaintiffs will be compensated for their injuries.

Tennessee law embodies similar principles to the laws of Pennsylvania and Texas. Tennessee employs a three-prong test for assessing proximate cause: (1) [T]he tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Russell v. Anderson County*, 2011 WL 486900, at *11–12 (Tenn.Ct.App. Feb. 11, 2011) (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn.1991)). Further, pursuant to Tennessee law, "[a]n injury may be proximately caused by more than one negligent act or omission[;] [t]hus, a negligent act or omission need not be the sole cause of an injury to be a proximate cause." *Id.* (citing *Kelley v. Johnson*, 796 S.W.2d 155, 159 (Tenn.Ct.App.1990) and *McClenahan*, 806 S.W.2d at 775). In addition, "it is not necessary that tortfeasors or concurrent forces act in concert, or that there be a joint operation or a union of act or intent, in order for the negligence of each to be regarded as the proximate cause of the injuries, thereby rendering all tortfeasors liable." *McClenahan*, 806 S.W.2d at 775. Tennessee operates a modified comparative fault system whereby a plaintiff may not recover in tort against a defendant if he was over 50 percent at fault. *See McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn.1992). If a plaintiff is less than 50 percent at fault, his damages are reduced in proportion to the percentage of the total recovery against the responsible parties. *Id.* As a consequence, "the proximate contributory negligence of the plaintiff is no longer a bar to recovery." *Reed v. McDaniel*, 2010 WL 623619 (Tenn.Ct.App. Feb. 23, 2010) (citing *McIntyre*, 833 S.W.2d at 57). Also under this regime, a defendant is "liable only for the percentage of a plaintiff's damages occasioned by that defendant's negligence," rendering contribution claims between co-defendants obsolete. *McIntyre*, 833 S.W.2d at 58.

In light of the foregoing, there is an actual conflict between the laws of causa-

tion provided under the Iraqi Civil Code when compared to the laws of the interested states.

### ii. Classification of the Conflict

Having found that there is an actual conflict between the potentially applicable laws, the Court must next classify the conflict in laws as either "true", "false" or "unprovided for". To do this, the Court looks to the policies underlying the laws of each jurisdiction and determines whether each jurisdiction has a governmental interest in applying its own laws. *Budget*, 407 F.3d at 170.

Both parties initially argued that this case presented a "true conflict"; however, the Court believes that this case actually presents a false conflict when comparing the proffered Iraqi law with the laws of the interested states. (*See* Docket Nos. 216, 218). KBR argues that Iraq has the greatest interest in its law being applied because it is the place of the wrong. (*See* Docket No. 221 ("Plaintiffs fail to address the long line of Pennsylvania cases holding that where the accident and all alleged tortious conduct took place in a particular forum, that forum's law will almost always apply.")). However, KBR seemingly ignores that Pennsylvania long ago abandoned the doctrine of *lex loci delicti*, and does not currently apply the law of the place of the wrong in tort cases. *Griffith*, 416 Pa. 1, 203 A.2d 796.

To this end, this case is analogous to *Budget Rent–A–Car System, Inc. v. Chappell*, 407 F.3d 166 (3d Cir.2005). That decision involved a vehicle accident in Pennsylvania wherein the plaintiff, a New York resident, was injured after her boyfriend, a Michigan resident, fell asleep at the wheel of the car. *Id.* Plaintiff was paralyzed as a result of the accident and brought suit against Budget, a Michigan corporation which had rented the vehicle involved in the accident, under a theory of vicarious liability. *Id.* The Court of Appeals applied Pennsylvania choice of law rules and noted that:

> It is clear that Pennsylvania does not have an interest in applying its law to this dispute. But for the chance occurrence of the accident in Pennsylvania, there is no connection between the Commonwealth and the parties. Pennsylvania has no interest in securing a recovery for [Plaintiff] nor in limiting Budget's liability.

*Budget Rent–A–Car System*, 407 F.3d at 177, n. 9. A survey of decisions applying Pennsylvania choice of law rules clearly demonstrates that the law of the place of the wrong no longer governs. *See e.g., Kunreuther v. Outboard Marine Corp.*, 749 F.Supp. 658 (E.D.Pa.1990) (applying Pennsylvania law to a products liability action wherein a resident of Pennsylvania was injured by a product manufactured and sold by an Illinois defendant in the United States but the injury occurred in Jamaica); *Manning v. Richards*, 15 Pa. D. & C.4th 91, 1992 WL 524239 (Pa.C.P. Jun. 19, 1992) (Pennsylvania law governed a lawsuit arising from an accident in Ocean City, Maryland between two Pennsylvania residents); *Davis v. Sch. Dist. of Philadelphia*, 91 Pa.Cmwlth. 27, 496 A.2d 903 (1985) (Pennsylvania law applied to an action wherein the plaintiffs and defendant were Pennsylvania residents but the accident occurred in Virginia); *Farrell v. David Davis Enterprises, Inc.*, 1996 WL 21128 (E.D.Pa. Jan. 19, 1996) (Pennsylvania law applied to a case where an accident occurred in New Jersey involving New Jersey plaintiffs and Pennsylvania defendants because the case involved a "false conflict"); *Carter v. Nat'l R.R. Passenger Corp.*, 413 F.Supp.2d 495 (E.D.Pa.2005) (Pennsylvania law applied to case involving an injury in Maryland, plaintiff from Penn-

sylvania and a defendant from the District of Columbia)

As discussed above in reference to the applicability of 16 U.S.C. § 457, KBR cites a number of decisions involving injuries on military bases and several arising under the Federal Tort Claims Act for support of its position that Iraqi law should be applied, including *Jenkins v. Whittaker,* 785 F.2d 720 (9th Cir.1986); *Burgio v. McDonnell Douglas, Inc.,* 747 F.Supp. 865, 867–68 (E.D N.Y.1990); *Shankle v. United States,* 796 F.2d 742, 744 (5th Cir.1986) (military base); *Lutz v. United States,* 685 F.2d 1178, 1182 (9th Cir.1982) (military base). However, those decisions are distinguishable because none of them applied Pennsylvania choice of law rules. The wrongful death decisions applied the choice of law rules of the jurisdiction where the lawsuit was filed and none of the cases were filed in Pennsylvania. On the other hand, the FTCA requires that courts apply the choice of law rules of the location of the injury.

▬ The Court now returns to Pennsylvania choice of law rules. Here, the Court has not been presented with any evidence of the policies underlying the causation law proffered by KBR. (*See* Docket No. 216–1). Professor Hamoudi's expert reports do not address such policies. (*Id.*; Docket No. 220–1). However, even assuming that among Iraq's reasons for adopting such a law is to protect a second actor from being held liable when the first actor's negligence would have caused the injury in the first instance, it is not clear that this policy will even be implicated in this case. Based on the prior arguments that have been presented to the Court in this case, the Court understands that KBR's position in this litigation is that the Army was allegedly negligent in its deci-

sions and actions related to housing soldiers in Iraqi buildings with known substandard electrical systems. By advancing the causation law under the Iraqi Civil Code, KBR argues that if that law were applied, the Army's negligence would subsume its own negligence, if any. But, as this Court has recognized in its prior decisions, Plaintiffs allege that KBR was negligent not only in its failure to act and to warn Staff Sergeant Maseth of known electrical hazards, but also for its negligent performance of maintenance services on LSF–B1 and the malfunctioning water pump. (*See* Docket No. 209). The evidence previously presented to the Court suggests that KBR fixed the actual water pump on more than one occasion and was aware that it had caused other soldiers to be shocked in the same shower where Staff Sergeant Maseth was killed. *See Harris,* 618 F.Supp.2d at 413–14. Thus, while Plaintiffs' failure to act and/or warn claims may be implicated by the stated Iraqi policy, it does not appear to apply to the negligent performance claims.

Iraq's interest in applying its law in this case is also questionable, at best. KBR argues generally that Iraqi has a strong interest in applying its laws to government contractors given the language in the recent Status of Forces Agreement removing the immunities previously afforded to government contractors and to situations wherein wrongful conduct occurs within its borders. (Docket Nos. 216, 221). KBR also implies that Iraq's laws are designed to foster investment in its nation by foreign companies, such as KBR, and to encourage such businesses to operate in Iraq.[10] (*Id.*).

This Court, however, does not believe that any of the interests identified by KBR

---

**10.** Again, this supposition is not supported by any evidence of the actual policy reasons un-

derlying Iraq's causation law. *See* § III.A., *supra.*

further the assumed policies underlying Iraq's causation laws, i.e., to protect a second negligent actor from liability when the first actor's negligence would have caused the harm without the second act. None of the parties to this dispute are from Iraq, although the alleged tortious activity and harm occurred within a military base positioned in that country. On the other hand, Plaintiffs have sustained loss here in Pennsylvania. Iraq's law may be defense oriented but the defendant here, KBR, is a United States corporation, situated in Texas. Even though KBR operates in locations around the world, there is simply no reason for it to be shielded by Iraq's pro-defendant law in this case. Further, the supposed policies underlying this aspect of Iraqi law will not be impaired if the law of Pennsylvania (or Tennessee) is applied.

KBR relies heavily on *Tonkon v. Denny's, Inc.*, 650 F.Supp. 119 (E.D.Pa.1986) in support of its position, but *Tonkon* is easily distinguishable from this case. In *Tonkon,* a Pennsylvania resident fell on a public sidewalk outside a Denny's restaurant in Mexico City, Mexico. Denny's is a California corporation. The Court in *Tonkon* applied Pennsylvania choice of law rules and, despite not referencing the actual laws of Mexico, found that Mexican law should be applied to Denny's alleged negligent conduct because "Mexico ... has a strong interest in regulating the conduct of corporations in its country, particularly foreign companies who invest in Mexican enterprises and, therefore, bolster its troubled economy." *Id.* at 122.

KBR's business operations in Iraq were not akin to Denny's operations in Mexico. KBR operated in Iraq under a contract with the United States Army to provide services in support of the United States' military mission. The Court agrees that, in 2008, that mission may have benefited

Iraq in some fashion, including, among other things, rebuilding Iraq's infrastructure and providing additional security. But, KBR certainly was not invited nor encouraged by Iraq's government to engage in business there. Instead, KBR's presence in Iraq was solely attributable to the United States' continued presence in that country after the initial invasion.

Further, Order 17 undermines Iraq's supposed interests in this litigation. *See* CPA Order 17. Pursuant to the CPA, Iraq agreed that government contractors such as KBR would not be subject to Iraq's laws in relation to their contracts, were immune from Iraqi process and that third party claims for personal injury and death should be resolved under the laws of the Sending State, i.e., the laws of the United States of America. CPA Order 17, §§ 4.2, 18. In addition, even though the immunity granted to government contractors was lifted by the execution of the Status of Forces Agreement, Order 17 was in effect on the date of Staff Sergeant Maseth's death, January 2, 2008. *See* CPA Order 17 § 20 (Effective Period, "This Order shall enter into force on the date of signature. It shall remain in force for the duration of the mandate ... and shall not terminate until the departure of the final element of the MNF from Iraq, unless rescinded or amended by legislation duly enacted and having the force of law.").

For these reasons, Iraq does not have any interest in applying its laws of causation to this case.

In contrast, Pennsylvania, Tennessee and Texas have pro-plaintiff causation laws, wherein negligent actors are held responsible for tortious conduct in proportion to the percentage of their negligence. Plaintiffs are Pennsylvania citizens. Staff Sergeant Maseth's estate is being administered in Tennessee. Thus, both Penn-

sylvania and Tennessee have a strong interest in applying their respective pro-plaintiff causation laws in this case. Moreover, the interests of these states in achieving full compensation for Plaintiffs and Staff Sergeant Maseth's estate would be impaired if Iraqi law were applied. KBR is headquartered in Texas. Because the only Texas citizen in this case is the defendant, Texas has little interest in applying its pro-plaintiff law to the instant causation issue.

### iii. Conclusion

██ In sum, Iraq has no interest in applying its causation law to this litigation, Texas has little interest in its law being applied, while the laws and policies of Pennsylvania and Tennessee would be impaired if Iraqi law was applied. Therefore, after applying Pennsylvania's choice of law principles, the Court finds that the conflict in laws results in a "false conflict" between the proffered Iraqi law and the laws of the interested states. When there is a false conflict, the court must apply the law of the only interested jurisdiction. *Budget Rent–A–Car*, 407 F.3d at 170. Here, Pennsylvania and Tennessee are both interested jurisdictions. There are subtle differences between the laws of Pennsylvania and Tennessee which potentially impact the present litigation. The present arguments, however, only tangentially address whether Pennsylvania or Tennessee law should be applied. Thus, the Court expresses no opinion regarding whether there is an actual conflict between these laws, or the classification of any potential conflict. At this juncture, the Court holds only that Iraqi causation law, as proffered by KBR, will not be applied.

### b. *Recovery of Pain and Suffering Damages by Heirs*

██ Under Iraqi law, "compensation for material harm that has befallen a dece-

dent victim, such as hospital or funeral expenses, is recoverable under Iraqi law, but compensation for moral harm such as pain and suffering or emotional distress *on the part of the decedent* (as opposed to his family members), is not." (*Id.* at ¶44). The proffered reasons or policies for this law include that Iraq's Civil System does not employ any procedure akin to the system of estates used in the United States after one's death and that under Iraqi legal theory the value of the pain and suffering of a decedent remains inchoate until a judicial ruling or agreement by parties. (*Id.*). Thus, if the individual dies, his heirs cannot claim a right to compensation for these injuries and damages. (*Id.*). Undoubtedly, this is a pro-defendant law and permits an otherwise negligent actor to be free from liability if his or her negligent conduct results in the death of the harmed individual.

However, Iraq has no interest in restricting the potential damage award against KBR in this case. Particularly apt here is holding by the Pennsylvania Supreme Court in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (Pa. 1964). The *Griffith* Court held that "the state in which injury occurred [. . .] has relatively little interest in the measure of damages to be recovered unless it can be said with reasonable certainty that defendant acted in reliance on that state's rule. Moreover, where the tort is unintentional, the reliance argument is totally untenable." *Griffith*, 416 Pa. at 24, 203 A.2d 796.

For the same reasons set forth above, KBR did not rely on Iraq's laws when deciding whether to do business there. Instead, it decided to do business with the United States Army. Its contracts with the Army, including the LOGCAP III base contract and Task Order 139 at issue here, make no reference to Iraqi law or Iraqi standards for construction, electrical work

or plumbing services. (*See e.g., LOGCAP III contract; LOGCAP III Contract, Statement of Work; Task Order 139* ); *see also Harris,* 618 F.Supp.2d at 403–415 (describing the contracts at issue). Likewise, Order 17 expressly provides that such contracts may be awarded in accordance with the laws of the United States. CPA Order 17, § 4.1. Order 17 also states that government contractors were: not subject to Iraqi laws or regulations in relation to the terms and conditions of their contracts; immune from Iraqi legal process; and that certain claims by third parties should be dealt with in accordance with the laws of the United States. CPA Order 17, §§ 4.2, 4.3, 18. In all, there is simply no evidence of KBR's actual reliance on Iraqi law in connection with its operations in Iraq.[11] Plaintiffs' claims against KBR rely on a negligence theory, and they also seek punitive damages based on alleged willful, reckless or otherwise actionable conduct by KBR. (Docket No. 209). However, they do not allege that KBR committed any intentional torts which caused Staff Sergeant Maseth's death. (*Id.*). Given same, under Griffith, any argument that KBR relied on Iraqi law in its actual operations "is untenable." *Griffith,* 416 Pa. at 24, 203 A.2d 796.

In sum, Iraq has no interest in protecting a foreign corporation from liability or damages to a non-citizen under a survival-type theory and KBR cannot be said to have relied on Iraq's laws because there is no evidence of actual reliance. For these reasons, Iraq's laws will not be impaired if the laws of another jurisdiction are applied.

Pennsylvania, Tennessee and Texas law clearly permit recovery for a decedent's pain and suffering and consequent damages. *See* 42 Pa.C.S. §§ 8301, 8302; Tex. Civ.Prac. & Rem.Code.Ann. §§ 71.002, 71.021; Tenn.Code.Ann. §§ 20–5–106–113, 20–5–101–105 and 114–120. The right to compensation in these jurisdictions accrues immediately on injury and survives the death of the decedent. *Id.* The policy reasons for these laws are to compensate the decedent's heirs for the harm suffered by the decedent while he or she was alive. The compensation is paid into the decedent's estate and, through the administration of the estate, those funds are used to pay off the decedent's creditors and the remaining funds are passed onto the decedent's beneficiaries. Here, again, Plaintiffs are Staff Sergeant Maseth's parents, who are also the administratrix and administrator of his estate. Plaintiffs have asserted claims against KBR in their own right under Pennsylvania's wrongful death statute. *See Baumgart v. Keene Building Products Corp.,* 430 Pa.Super. 162, 633 A.2d 1189, 1191–92 (1993) ("in a wrongful death cause of action, recovery depends upon the rights of action that the beneficiaries, as named by statute, possess. Moreover, recovery amounts to the pecuniary loss suffered by the beneficiaries by being deprived of the part of the decedent's earnings they would have received had the decedent lived."); *Moyer v. Rubright,* 438 Pa.Super. 154, 651 A.2d 1139, 1141 (1994) ("wrongful death is not the deceased's cause of action. An action for wrongful death may be brought only by specified relatives of the decedent to recover damages in their own behalf, and not

---

**11.** Of course, KBR continues to rely on the laws of the United States to defend this litigation, including raising the following defenses: the political question doctrine which relies on the text of the United States Constitution; the combatant activities exception to the Federal

Tort Claims Act, a federal statute; and has also raised the government contractor defense under *Boyle v. United Technologies Corp.,* 487 U.S. 500; 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), Supreme Court jurisprudence, in its Answer. (*See* Docket No. 217).

as beneficiaries of the estate. Wrongful death damages are implemented to compensate the spouse, children, or parents of the deceased for the pecuniary loss they have sustained by the denial of future contributions decedent would have made in his or her lifetime.") *see also* 42 Pa.C.S.A. § 8301.[12] In this claim they seek damages that they have suffered as a result of KBR's alleged negligent conduct. *Id.* They are also administering Staff Sergeant Maseth's estate in Tennessee and Tennessee's laws are potentially implicated.[13]

Thus, Pennsylvania and Tennessee clearly have an interest in their respective laws being applied to this case. Texas has no interest because its citizen, KBR, is not seeking to invoke its survival laws.

Like the causation issue, the Court is presented with a "false conflict." Iraq and Texas have no interest in the application of their respective laws, but the laws of Pennsylvania and Tennessee would be impaired if Iraqi law were applied. Accordingly, KBR's motion to apply Iraqi survival law is denied.[14]

**12.** 42 Pa.C.S.A. § 8301 provides that:

(a) General rule.—An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

(b) Beneficiaries.—Except as provided in subsection (d), the right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased, whether or not citizens or residents of this Commonwealth or elsewhere. The damages recovered shall be distributed to the beneficiaries in the proportion they would take the personal estate of the decedent in the case of intestacy and without liability to creditors of the deceased person under the statutes of this Commonwealth.

(c) Special damages.—In an action brought under subsection (a), the plaintiff shall be entitled to recover, in addition to other damages, damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

(d) Action by personal representative.—If no person is eligible to recover damages under subsection (b), the personal representative of the deceased may bring an action to recover damages for reasonable hospital, nursing, medical, funeral expenses and expenses of administration necessitated by reason of injuries causing death.

**13.** To this end, KBR argues that "[t]he mental suffering of the parents is not an element of damage for which [Tennessee] law allows compensation", quoting *Garis v. Eberling*, 18 Tenn.App. 1, 71 S.W.2d 215, 231 (1934). In this Court's estimation, Plaintiff's Amended Complaint does not expressly seek this type of damages on behalf of Plaintiffs themselves. (Docket No. 209). However, the Court notes that in *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 601–602 (Tenn.1999), the Supreme Court of Tennessee held that under Tennessee's wrongful death and survival statutes, "consortium-type damages may be considered when calculating the pecuniary value of a deceased's life." *Id.* Further, "[l]oss of consortium consists of several elements, encompassing not only tangible services provided by a family member, but also intangible benefits each family member receives from the continued existence of other family members. Such benefits include attention, guidance, care, protection, training, companionship, cooperation, affection, love ..." *Id.*

**14.** In so holding, the Court notes that it is interesting that on one hand KBR advocates that 16 U.S.C. § 457, a federal statute which generally authorizes an individual to bring a wrongful death and survival claim arising from injuries which occur on federal land, should apply, while simultaneously arguing that Iraqi law does not permit such claims. As set forth in the legislative history supplied by KBR, the purpose of section 457 was to provide a right of action for wrongful death and survival under federal law where it was not previously available. *See* n. 5, *supra.* Adoption of KBR's argument would frustrate this clearly stated purpose.

## C. Damages—Punitive Damages

Punitive damages are not available under Iraqi law. (Docket No. 216–1 at ¶ 49). The reasons proffered for the lack of punitive damages are that: the Iraqi Civil System permits damages for the purposes of compensation and making a victim whole, only; the Iraqi Criminal System is designed to punish and deter conduct; and, the Iraqi Criminal System takes precedence above all civil actions to the extent that a civil action is stayed pending any criminal prosecution resulting from the same set of facts and circumstances. (Docket No. 216–1 at ¶¶ 49–56).

In contrast, punitive damages are available under the laws of Texas, Tennessee and Pennsylvania. *See Hutchison ex rel. Hutchison v. Luddy*, 582 Pa. 114, 870 A.2d 766 (Pa.2005) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others"); Tex. Civ. Prac. & Rem.Code § 41.001(5) ("'exemplary damages' means any damages awarded as a penalty or by way of punishment but not for compensatory purposes ... 'exemplary damages' includes punitive damages."); *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 849 (Tenn.2010) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992). ("To be entitled to an award of punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant 'acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.' ")). The laws of these jurisdictions permit punitive damages in order to punish conduct that rises to the levels of culpability needed to sustain a claim for punitive damages. *See e.g., Hutchison*, 582 Pa. at 121–22, 870 A.2d 766 ("The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct."); Tex. Civ.

Prac. & Rem.Code § 41.001(5); *Sanford*, 328 S.W.3d at 849 (internal quotations omitted) ("punitive damages are intended to punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him"). The purposes for punitive damages under Pennsylvania and Tennessee law also include deterrence, while Texas appears to have abandoned deterrence as a reason for punitive damages. *See Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 676–77 (Tex.2008) ("In 1995, the Legislature renumbered the provision Section 41.001(5) and amended it to delete the phrase, 'as an example to others', leaving punishment as the sole purpose of punitive damages." and "[t]he Legislature's enlargement of the scope of Chapter 41 over time reflects its intent to establish punishment of the defendant as the sole purpose of punitive damages in Texas.").

At the outset, the Court notes that it expresses no opinion regarding whether an award of punitive damages would be proper at this early juncture of the litigation, or which state's laws governing punitive damages apply here. However, weighing the policies and respective interests of the relevant jurisdictions, the Court is again faced with a "false conflict" between the laws of Iraq vis-à-vis the laws of Texas, Tennessee and Pennsylvania. The reasoning employed above regarding the potential recovery of pain and suffering damages is equally applicable here.

In addition, KBR is an American corporation (Texas) and American laws (Texas law) generally authorize an award of punitive damages if the circumstances permit same. As such, KBR should expect that it may be liable for punitive damages if its conduct supports such an award, regardless of where it occurs and especially in instances where claims are brought against it by fellow Americans. A leading

treatise suggests that "[i]n the international sphere it is generally considered appropriate to apply the laws of the domiciliary state to tort claims that involve the residents of a single country." *Hays, et al., Conflict of Laws* § 17.57 (5th ed. 2010). Those commentators further state that:

> It is true that, when the conduct occurs in a state that does not allow punitive damages, that state has a certain interest in applying its law to protect that conduct. However, the fact that the consequences of that conduct are felt in another state and are caused by a tortfeasor domiciled in a third state that also imposes punitive damages puts that interest in juxtaposition with the contrary interests of the latter two states. On balance, it is reasonable to conclude that the interest of the conduct state must give way.

*Id.* at § 17.50.

The proffered policy underlying the lack of punitive damages in Iraq, i.e., the relationship between the criminal and civil laws of Iraq, is not violated by the application of punitive damages laws of another jurisdiction in this case. There has been no suggestion that Iraqi authorities undertook a criminal investigation of any kind arising from the facts and circumstances of this case. However, as the parties are well aware, the United States Army investigated the facts and circumstances of this case and declined to bring criminal charges against KBR. (*See* Docket No. 186–3, Army Completes Staff Sgt. Maseth Death Investigation; August 7, 2009). Indeed, the fact that the United States undertook the criminal investigation undermines Iraq's supposed interest in administering its laws in the manner described by Professor Hamoudi. In addition, as a government contractor, KBR was immune from suit in Iraq at the time of Staff Sergeant Maseth's death. *See* CPA Order 17, § 4.3. Thus, Iraq's interest in administering its criminal and civil laws in the manner described by Professor Hamoudi is not implicated.

To conclude, the issue of punitive damages presents yet another "false conflict" between the laws of Iraq and the laws of the interested states. The purposes underlying the absence of punitive damages in Iraqi law will not be impaired if the laws of one of the interested states is applied. In contrast, the laws of the interested states will be impaired if Iraqi law is applied. Finally, as noted above, KBR is a Texas corporation and should expect that punitive damages may be awarded against it as a result of its conduct both here and abroad, especially in cases involving plaintiffs from the United States.[15] Like before, the Court reserves ruling on the appropriate state law to be applied to Plaintiffs' claim for punitive damages in this case until a factual predicate has been

**15.** To this end, the Court notes that the plaintiff in the matter of *Jones v. Halliburton Co., et al.*, Civ. A. No. 4:07–cv–02719 (S.D.Tex), in which KBR is also a defendant, has asserted a claim for punitive damages against KBR under Texas law. *See Jones,* Civ. A. No. 4:07–cv–02719, Docket No. 222. The plaintiff in *Jones*, a former KBR employee, alleges that she was forcefully raped by a former co-worker while they were stationed at Camp Hope in Iraq. *Id.* In the District Court's most recent opinion in that case, *see Jones*, 791 F.Supp.2d 567, 2011 WL 2066621, there is no suggestion that Iraqi law should be applied. *Id.* Instead, the court analyzes Texas common law principles in relation to employment-related claims advanced under the Texas Commission on Human Rights Act and Title VII of the Civil Rights Act. *Id.* KBR has argued, among other things, that the plaintiff's common law claims arising from the rape were precluded by her claims under the Texas Commission on Human Rights Act under what amounts to a sexual harassment hostile work environment theory. *Id.* A jury trial commenced in this case on June 13, 2011.

shown and the issues are fully briefed and argued by the parties.

### D. Conclusion—Pennsylvania Choice of Law Rules

Even if KBR had met its burden to demonstrate Iraqi law to the Court, after applying Pennsylvania choice of law rules to this action, the Court finds that Iraq has no interest in the application of its laws of causation, survival and punitive damages to this litigation. Accordingly, KBR's motion to apply Iraqi law fails under this Court's analysis.

### IV. CONCLUSION

Based on the foregoing, KBR's motion to apply Iraqi is denied. The Court's holding is limited to this issue and the Court expressly reserves ruling as to which of the interested states' laws apply to Plaintiffs' claims and KBR's defenses in this action going forward. An appropriate Order follows.

### MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court are Defendant Kellogg, Brown & Root Services, Inc.'s ("KBR") motion for reconsideration of the Court's June 17, 2011 Memorandum Opinion and Order denying its motion for the application of Iraqi law to this case (Docket No. 241) and Plaintiffs Cheryl A. Harris and Douglas Maseth's ("Plaintiffs") response thereto (Docket No. 244). KBR asserts that the Court committed numerous errors in resolving its motion for the application of Iraqi law, while Plaintiffs

find no errors in the Court's discussion. (Docket Nos. 242, 244). Upon consideration of the parties' submissions and the relevant standard governing motions for reconsideration, and for the following reasons, KBR's motion [241] is denied.

### II. BACKGROUND [1]

This action arises out of the tragic death of Staff Sergeant Ryan D. Maseth, who was electrocuted while showering at a military base in Iraq. *Harris*, 796 F.Supp.2d at 646–47, 2011 WL 2462486, at *1. His parents, who are administering his estate, brought this action against KBR, the private defense contractor that contracted with the United States Army to provide maintenance services at the base, alleging, among other things, that KBR's negligence in its performance or non-performance of certain maintenance services was the proximate cause of Staff Sergeant Maseth's death. *Id.* at 646–48, at *1–2.

Pertinent here, KBR filed a motion requesting that Iraqi law be applied to this case, citing three separate provisions of the Iraqi Civil Code. (Docket No. 215). After considering the parties' extensive briefing, evidentiary submissions and hearing oral argument from counsel at a motion hearing on April 5, 2011, the Court denied KBR's motion for the application of Iraqi law on June 17, 2011. *Harris v. Kellogg, Brown and Root Services, Inc.*, 796 F.Supp.2d 642, 2011 WL 2462486 (W.D.Pa. Jun. 17, 2011). In its decision, the Court denied KBR's motion on two, alternative bases, holding that: (1) KBR

---

**1.** The Court limits its discussion of the background to the facts relevant to the disposition of the instant motion for reconsideration. For further discussion of the facts, please consult the prior decisions by this Court and the United States Court of Appeals for the Third Circuit. *See Harris v. Kellogg, Brown and Root Services, Inc.*, 618 F.Supp.2d 400 (W.D.Pa.2009), *appeal dismissed*, 618 F.3d 398 (3d Cir.2010); *Harris*, 2010 WL 4614694 (W.D.Pa. Nov. 5, 2010) (denying KBR's motion for entry of a case management order); *Harris*, 796 F.Supp.2d 642, 2011 WL 2462486 (W.D.Pa. Jun. 17, 2011) (denying KBR's motion for the application of Iraqi law).

failed to meet its burden under Rule 44.1 to present evidence of the potentially applicable Iraqi law and to persuade the Court that such law should apply; and (2) after applying Pennsylvania choice of law rules, and weighing the interests of the potentially interested jurisdictions, Iraq, Pennsylvania, Texas and Tennessee, the proffered Iraqi laws would not be applied. *Id.* The Court also expressly reserved ruling as to which of the interested states' laws will apply to Plaintiffs' claims and KBR's defenses. *Id.* at 668, at *21.

Dissatisfied with the Court's decision, KBR filed the instant motion for reconsideration on July 1, 2011. (Docket No. 241). Along with its motion, KBR submitted a brief in support, a third affidavit from Professor Hamoudi and an amicus brief submitted by the Solicitor General's Office to the Supreme Court in *Saleh et al. v. Titan Corp. et al.* (Docket No. 242). KBR alleges that the Court committed numerous errors in its decision and also requested that the Court schedule oral argument on its motion. (*Id.*). Plaintiffs filed their brief in opposition to KBR's motion for reconsideration on July 11, 2011, opposing both reconsideration and the request for an additional hearing. (Docket No. 244). The Court denied KBR's request for a hearing on August 24, 2011 (Docket No. 245) and notified the parties that the motion would be submitted on the briefs. As all briefing has concluded, the motion is now ripe for disposition.

### III. LEGAL STANDARD

■■ It is well settled that reconsideration of a prior order is only warranted if the moving party demonstrates: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a mani-

fest injustice. *Max's Seafood Café by Lou–Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999) (citing *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995)); *see also Bootay v. KBR, Inc.,* 437 Fed.Appx. 140, 146–47, No. 10–4028, 2011 WL 2713804, at *5 (3d Cir.2011) (noting same legal standard on a motion for reconsideration).

■■ A party's mere disagreement with the Court does not translate into the type of clear error of law which justifies reconsideration of a ruling. *Miller v. Lamas,* 2011 WL 398408, at *1, Civ. Act. No. 10–51 (M.D.Pa. Feb. 2, 2011) (citing *Dodge v. Susquehanna Univ.,* 796 F.Supp. 829, 830 (M.D.Pa.1992)). Furthermore, "because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly." *Id.* (quoting *Continental Casualty Co. v. Diversified Indus., Inc.,* 884 F.Supp. 937, 943 (E.D.Pa.1995)). It is evident that a motion for reconsideration is not a tool to re-litigate and reargue issues which have already been considered and disposed of by the Court. *Id.* (citing *Dodge,* 796 F.Supp. at 830). Rather, such a motion is appropriate only where the court misunderstood a party or where there has been a significant change in law or facts since the Court originally ruled on that issue. *Id.* (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)).

### IV. DISCUSSION

In light of the aforementioned legal standard, the Court will first address the alleged changes in law and/or new evidence presented by KBR and will then discuss KBR's claims that the Court committed legal and factual errors.

#### A. *Changes in Law/New Evidence*

First, the Court finds that the two documents KBR has attached to its motion for

reconsideration, i.e., the Solicitor General's Brief for the United States as Amicus Curiae filed with the Supreme Court in *Saleh et al. v. Titan Corp. et al.*, and a third affidavit from Professor Hamoudi, do not constitute new evidence or represent changes in the controlling law which would warrant reconsideration. (Docket Nos. 242–1, 242–2).

▮ To this end, the Solicitor General's brief in the *Saleh* case was filed in May of 2011. (Docket No. 242–2). Thus, it was available prior to the Court's disposition of the motion for application of Iraqi law on June 17, 2011. *Harris*, 796 F.Supp.2d 642, 2011 WL 2462486. Although the brief is filed by the Solicitor General on behalf of the United States, it is not binding authority. It simply represents the position of that Office on behalf of the United States in the *Saleh* litigation. (*See* Docket No. 242–1). Specifically, it addresses the issue of whether the Supreme Court should grant a writ of certiorari and review the *Saleh* decision. (*Id.*). Therefore, the Solicitor General's brief constitutes neither a change in the law nor new evidence that was unavailable prior to the Court's disposition of the present motion.[2] *See Max's Seafood Café by Lou–Ann, Inc.*, 176 F.3d at 677. Accordingly, KBR's motion for reconsideration is denied to the extent that it is based on the Solicitor General's brief.

A third affidavit from Professor Hamoudi is also now before the Court. (Docket No. 242–1). It contains further analysis of CPA Order 17, particularly section 18. (*Id.*). As the Court noted in the Opinion denying KBR's motion for the application of Iraqi law, Hamoudi's analysis of this section was absent from his first and second affidavits. *Harris*, 796 F.Supp.2d at 650–51, 652–54, 2011 WL 2462486, at *5, 7– 8. But, from the Court's view, Hamoudi's analysis could have and should have been included given that the interpretation of section 18 was contested by the parties. *Id.* at 652–54, at *7–8. Hamoudi actually admits that he previously offered expert opinions in federal litigation about CPA Order 17 prior to his engagement in this case. (Docket No. 242–1). But, Hamoudi explains that he only offered his opinions regarding CPA Order 17 in his second affidavit in this case because he thought that it did not apply in any fashion. (*Id.*). Therefore, the evidence presented in the third affidavit is not "newly discovered" as it was available prior to the Court's disposition of the subject motion. *See Max's Seafood Café*, 176 F.3d at 677. For reasons left unstated, KBR and Hamoudi apparently decided not to include this information in their earlier submissions. As the evidence is not newly discovered, KBR's reliance on same does not support its motion for reconsideration.

The Court further notes that both KBR and Hamoudi appear to misunderstand why the Court questioned his "credibility" in the Opinion. (Docket Nos. 242, 242–1). It had nothing to do with his qualifications, as they suggest. (*Id.*). His qualifications were accepted by Plaintiffs and the Court. *See Harris*, 2011 WL 2462486 at n. 1 ("Plaintiffs have not contested that Professor Hamoudi is properly qualified as an

---

**2.** The Court also agrees with Plaintiffs that the Solicitor General's position set forth in the brief does not wholly support KBR's position in this case. In *Saleh*, the contractors were used in the roles of interpreters and interrogators and effectively operated as soldiers in those roles, (*see* Docket No. 242–2), as opposed to the operations and mainte-

nance services provided by KBR and its employees in this case. Indeed, this Court previously distinguished the lower court decisions in that litigation for the same reasons in our Opinion denying KBR's motion to dismiss. *See Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F.Supp.2d 400, 433 (W.D.Pa.2009).

expert in Iraqi law."). The Court simply questioned why Hamoudi ignored CPA Order 17 in his initial affidavit and then only addressed two of the three sections which were raised by Plaintiffs in his second affidavit.[3] *Harris,* 796 F.Supp.2d at 652–54, 2011 WL 2462486, at *7–8. Perhaps Hamoudi's opinions regarding CPA Order 17 and section 18 were left out as a part of KBR's litigation strategy? To this end, KBR argued in its first pleading in this case, its Notice of Removal filed on *April 22, 2008,* that CPA Order 17 was applicable and controlling in this case. (*See* Docket No. 1, Notice of Removal, ¶¶ 30, 38).[4] However, despite these claims made at the outset of the litigation, KBR's retained expert, Hamoudi, failed to address CPA Order 17, until he was prompted to

do so by the Plaintiffs. Indeed, Hamoudi was plainly aware of CPA Order 17 given his significant experience with Iraqi law and his work as an expert in other federal litigation specifically addressing CPA Order 17. He even admitted in his second affidavit that CPA Orders were a valid part of Iraqi law. (Docket No. 220–1 at ¶ 2). As a consequence, the only reasonable conclusion that can be drawn from these facts is that KBR's legal team and its expert witness made deliberate choices to abandon KBR's earlier arguments which relied on CPA Order 17 in favor of what they perceived to be a stronger argument under the Iraqi Civil Code. From the Court's view, the expert's opinions are therefore tainted by KBR's evolving litigation strategy[5] enough to question his

3. Specifically, the Court stated:
Hence, the Court questions the credibility of the defense expert, given the lack of any reference to Order 17 in his initial report and the lack of completeness in his supplemental report. *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 268 (3d Cir.2000) (holding that under Rule 44.1 "the District Court is in the best position to determine what at this point is essentially a credibility issue—i.e., which expert to believe.").
(Docket No. 235 at 652).

4. Specifically, KBR argued that "[i]n addition, because KBRSI was acting pursuant to its contract with the military, it enjoys immunity from suit pursuant to Order 17 and other guidelines set forth by the Coalition Provisional Authority ('CPA'), the provisional Iraqi government organized by the United States and its coalition partners after the 2003 invasion in Iraq. *See, e.g.,* CPA Order Number 17 (Revised) (signed on June 27, 2004 by L. Paul Bremer, U.S. Ambassador and CPA Administrator) (Section 4—Contractors: "Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto." (Docket No. 1 at ¶ 30). KBR further asserted that "[t]he case also will require the interpretation and application of Coalition Provisional Authority Order 17, which provides immunity for contractors pro-

viding services in Iraq"). (Docket No. 1 at ¶ 38).

5. From this Court's view, KBR's litigation strategy in this case—as exemplified by the CPA Order 17 issue—is one that constantly shifts to a point where it eventually takes contradictory positions. For example, KBR argued in its initial motion to dismiss that the United States Army exercised an "envelope of control" over KBR and its activities at the RPC such that the political question doctrine barred the Plaintiffs' lawsuit. As is discussed below, KBR now claims that Iraq had much more of a presence at the RPC in an effort to show that its law should apply to Plaintiffs' common law claims. Finally, the Court notes that in the *Bootay* litigation, which also involved a personal injury claim by a soldier against KBR for claimed injuries he sustained in Iraq, KBR agreed that Pennsylvania law governed the plaintiff's negligence claims. *See Bootay,* 437 Fed.Appx. 140, at n. 3, 2011 WL 2713804, at n. 3 ("The parties [Bootay and KBR] do not dispute that Pennsylvania law applies to this case. Consequently, we shall apply Pennsylvania law.").

The Court further notes that in *Bootay,* the Court of Appeals affirmed Judge McVerry's decision that KBR did not owe a duty to warn Bootay of the hazards of sodium dichromate exposure under general negligence principles, KBR's contract with the government or a

"credibility" for not apprising the Court of the full body of Iraqi law which was potentially applicable in this case.[6]

For these reasons, KBR's motion for reconsideration is denied to the extent that it has not sufficiently demonstrated any change in the applicable law or presented any new evidence which support reconsideration of the Court's Memorandum Opinion. *See Max's Seafood Café*, 176 F.3d at 677.

### B. *Errors of Law/Fact*

KBR next claims that the Court made a number of erroneous legal conclusions and factual findings during its analysis of whether Iraqi law should apply to this case. (Docket No. 242). Specifically, KBR challenges the Court's analysis of CPA Order 17, its application of Pennsylvania choice of law rules and essentially all other aspects of the Court's decision. Plaintiffs find no error with the Court's analysis. (Docket No. 244). From the Court's view, KBR "protests too much"

and, for the following reasons, has not demonstrated that reconsideration of the Court's decision is warranted.

#### 1. *CPA Order 17*

##### i. Improper Interpretation of the Court's Opinion

KBR asserts a number of arguments denigrating the Court's analysis of CPA Order 17. (Docket No. 242). Before addressing KBR's specific positions, the Court notes that KBR's arguments suggest that its counsel simply misreads the Court's June 17, 2011 Memorandum Opinion. The only relief that KBR requested in its motion was that three specific Iraqi legal principles should be applied in this case, i.e., those set forth in Articles 205, 207 and 211 of the Iraqi Civil Code. (Docket No. 215). As a result, the Court limited its holding to whether the three provisions of the Iraqi Civil Code cited by KBR applied to this litigation. *See Harris*, 796 F.Supp.2d at 646–47, 2011 WL 2462486, at *1 ("In this Memorandum Opinion, the Court addresses the narrow question of whether Iraqi law should be applied to

---

third party beneficiary theory. *Id.* at 141–42, at *1. The Court of Appeals analyzed these claims under Pennsylvania law, which has adopted provisions of the Restatement (Second) of Torts. *Id.* at 143–46, at *3–4. In so holding, the Court of Appeals also referenced this case and noted that:

> Bootay's reliance on *Harris v. Kellogg, Brown & Root Services, Inc.*, 618 F.Supp.2d 400 (W.D.Pa.2009), in support of his negligence claim is also misplaced. That case involved KBR's performance of a contractual obligation to repair defective wiring, and the tragic consequences of its negligent performance of this contractual obligation. In this case, by way of contrast, Bootay cannot point to any contractual obligation on the part of KBR that would impose upon it a duty to warn soldiers of sodium dichromate exposure.

*Id.* at n. 5.

6. To this end, the purpose of Rule 44.1 is to afford the parties the opportunity to educate

the Court regarding the potentially applicable foreign law. *See Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440 (3d Cir.1999). ("The parties ... generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a particular case."). In this Court's estimation, the requirements of Rule 44.1 cannot be met if a party does not provide the Court with the full body of law or relies only on certain portions of same while failing to disclose others. *Id.* This Court expects candor from the attorneys who appear before it, including attorneys acting as expert witnesses. *See* PA.R.PROF.CONDUCT. § 3.3(a)(2) ("A lawyer shall not knowingly ... fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.").

certain of Plaintiffs Cheryl Harris and Douglas Maseth's ("Plaintiffs") claims in this case, as requested by Defendant Kellogg, Brown & Root Services, Inc. ("KBR") "); *Id.* at 668, at *21 ("Based on the foregoing, KBR's motion to apply Iraqi is denied. The Court's holding is limited to this issue"). The Court concluded that these three provisions did not apply and then "expressly reserve[d] ruling as to which of the interested states' laws [will] apply to Plaintiffs' claims and KBR's defenses in this action going forward." *Id.* at 668, at *21.

KBR claims that the Court's reasoning offered in support of its holding is "internally inconsistent"[7] but fails to recognize that the Memorandum Opinion actually sets forth alternative rulings: (1) that KBR failed to meet its burden under Rule 44.1 to present the Court with applicable Iraqi law because KBR only presented the Court with Iraqi Civil Code provisions and failed to thoroughly address the relevant sections of CPA Order 17; and (2) that under a Pennsylvania choice of law analysis, the provisions of the Iraqi Civil Code proffered by KBR would not apply when compared with parallel provisions under the laws of Texas, Pennsylvania, and Tennessee. (Docket No. 235). The Rule 44.1 issue was not raised by either party and was considered *sua sponte*. Although the Court found against KBR on the Rule 44.1 issue, the Court assumed that KBR had met its burden under Rule 44.1 and fully analyzed the choice of law issues under Pennsylvania law in the second portion of the Memorandum Opinion. *See Harris,* 796 F.Supp.2d at 654–55, 2011 WL 2462486, at *9. As a consequence, KBR's protestations are without merit.

ii. CPA Order 17 is "Merely a Part of Iraqi Law" and cannot supplant Pennsylvania Choice of Law Rules

■■■ KBR further claims that the Court's analysis of CPA Order 17 ignored Pennsylvania choice of law rules. (Docket No. 242 at 2). However, KBR presented this identical argument in its Reply Brief, submitted before the Court's Memorandum Opinion was issued, as follows:

*A. Coalition Provisional Authority Order 17 Does Not Preclude the Application of Iraqi Law to This Suit*

Plaintiffs ask this Court to abandon Pennsylvania's well-settled choice-of-law framework based on a now-defunct order issued by the Coalition Provisional Authority ("CPA") in Iraq.

The CPA was the governing body established by Coalition forces following the invasion of Iraq. Plaintiffs boldly assert that CPA Order 17 bars this Court from performing any choice-of-law analysis under Pennsylvania law. See Pls.' Opp'n at 4 ("It may not even be necessary for this Court to proceed to a choice of law analysis under Pennsylvania law."). Plaintiffs' argument is fundamentally flawed.

*1. CPA Order 17 Does Not Affect the Court's Analysis of Choice of Law*

CPA Order 17 was a temporary order issued by a transitional authority whose

---

**7.** KBR's challenge to the Court's reasoning is confusing. On one hand, KBR claims that "[t]he Opinion is internally inconsistent. The first half of the Opinion holds that the controlling Iraqi law is CPA Order 17, and not the Iraqi Civil Code. The second half engages in a choice of law analysis wherein the Court considers the relevant Iraqi law to be the Iraqi Civil Code. If the Court is correct that CPA Order 17 applies, and that the Iraqi Civil Code cannot apply, then the choice of law analysis should consider CPA Order 17 as the relevant Iraqi law." (Docket No. 242). But, in its introduction, KBR states the correct interpretation of the Opinion—noting that the Court denied its motion "on two separate grounds." (Docket No. 242 at 1).

sole purpose was to govern Iraq. As such, CPA Order 17 does not, and could not, require this Court to disregard Pennsylvania law. To the extent CPA Order 17 has any relevance here, the order would merely define the substance of potentially-applicable Iraqi law. In other words, as at least one other court has readily acknowledged, CPA Order 17 does not supplant a choice-of-law analysis; it merely informs the substance of one forum's law, after such analysis is performed. *See Al Quraishi v. Nakhla*, 728 F.Supp.2d 702 (D.Md. 2010), appeal docketed, No. 10–1891 (4th Cir. Aug. 6, 2010) (performing choice-of-law analysis without regard to CPA Order 17, determining Iraqi law applied under Maryland's lex loci delecti rule, and declining to reach the issue of how CPA Order 17 might affect application of Iraqi law pending further discovery). (Docket No. 220 at 1–2). As this argument was presented to the Court and soundly rejected, it should not be reconsidered because parties are not permitted to use a motion for reconsideration to simply "re-litigate old matters." *See Miller*, 2011 WL 398408, at *1.

■ In any event, KBR's argument is misplaced. KBR had the burden to establish foreign law under Rule 44.1 which was independent of any choice of law analysis. *See* Fed.R.Civ.P. 44.1. As this Court recognized, Rule 44.1 places the burden on the parties to both present evidence of the foreign law and to persuade the Court that such foreign should be applied. *Id.* In its initial motion, KBR only requested that three specific Iraqi Civil Code provisions

be applied. (Docket No. 215). Therefore, it was entirely appropriate and consistent with the Federal Rules of Civil Procedure and Third Circuit precedent for the Court to first consider whether KBR had met its burden to present Iraqi law before considering Pennsylvania choice of law rules. If KBR failed to meet its burden to present Iraqi law, the substance of Iraqi law would not be established and Pennsylvania choice of law rules would be applied, without consideration of *any* Iraqi laws. *See Harris*, 796 F.Supp.2d at 651–54, 2011 WL 2462486, at *6–8. But, in this case, even though the Court found that Iraqi law (under its Civil Code) was not established by KBR, the Court assumed that it had met its burden and considered each of the provisions of the Iraqi Civil Code proffered by KBR in its choice of law analysis. *See Harris*, 796 F.Supp.2d at 654, 2011 WL 2462486, at *9 ("Notwithstanding that the Court has concluded that KBR has failed to meet its burden under Rule 44.1, and KBR's motion fails on this basis alone, the Court will continue with its analysis of the remainder of the parties' arguments.").

In his third affidavit, Hamoudi finally offers his opinion regarding section 18 and posits that it is a choice of law provision rather than a provision of substantive law.[8] (Docket No. 242–1 at ¶ 7). Specifically, Hamoudi states, in pertinent part, that:

> As for Section 18 of CPA Order 17, . . . *the phrase "in a manner consistent with the Sending State's laws, regulations and procedures" merely refers to the self-evident (and hardly worth noting) proposition that the court in the*

---

**8.** This portion of Hamoudi's report appears to run counter to KBR's initial briefing on these issues, where it argued that "[t]o the extent CPA Order 17 has any relevance here, the order would merely define the substance of potentially-applicable Iraqi law. In other words, as at least one other court has readily

acknowledged, CPA Order 17 does not supplant a choice-of-law analysis; it merely informs the substance of one forum's law, after such analysis is performed." (Docket No. 220). This also calls into question the credibility or reliability of the expert opinion advanced by KBR.

*relevant state will apply its own choice of law rules and its own public policy limitations to determine which law should apply.*

(Docket No. 242–1 at ¶ 7 (emphasis added)). This is exactly how the Court proceeded in the second half of the Memorandum Opinion, which undermines KBR's argument to the contrary.

KBR next complains that the Court erred by not applying CPA Order 17 in its choice of law analysis but fails to mention how the Court's analysis under Pennsylvania choice of law rules would be any different if CPA Order 17 was considered in the second portion of the Court's decision. (Docket No. 242). Again, the Court's interpretation of CPA Order 17 is that the laws of the sending states, rather than Iraqi laws, apply to personal injury claims for death. *See Harris,* 796 F.Supp.2d 642, 2011 WL 2462486. Based on this interpretation, the Court would apply Pennsylvania choice of law rules to determine the applicable substantive law. If Iraqi law was not considered, the Court would then analyze the laws of Texas, Pennsylvania and Tennessee in its choice of law analysis. Instead of proceeding in this regard, the Court assumed that KBR had met its burden under Rule 44.1 and analyzed whether the laws of Iraq, Texas, Pennsylvania or Tennessee should be applied. It appears that KBR simply disagrees with the Court's conclusion that Pennsylvania choice of law rules do not dictate that Iraqi law should be applied. *See Miller,* 2011 WL 398408, at *1 ("A party's mere disagreement with the Court does not translate into the type of clear error of law which justifies reconsideration of a ruling."). And, as discussed below, the Court does not find that KBR has met its burden to demonstrate that reconsideration of this aspect of the Court's holding is warranted.

iii. The Court held that KBR is immune

In yet another challenge to the Court's analysis of CPA Order 17, KBR suggests that the Court held that it is immune under Iraqi law and states that the Court should dismiss the case on this basis. (Docket No. 242 at 4, n. 1). To the extent that KBR makes such suggestion, the Court does not agree. To the contrary, the Court finds that CPA Order 17 provides only that government contractors such as KBR are "immune from Iraqi legal process" and does not provide any immunity from the present lawsuit. (Docket No. 218–2 at § 4.3 ("Contractors shall be immune from Iraqi legal process with respect to acts performed by them pursuant to the terms and conditions of a Contract or any sub-contract thereto.")). Therefore, the Court will not dismiss this case on this basis.

2. *The Court Engaged in a Flawed Choice of Law Analysis*

KBR also contests the Court's choice of law analysis, arguing that the Court erred in its balancing of the interests between the potential jurisdictions. (Docket No. 242). It argues that the Court misapplied the facts and gave improper weight to certain of the facts of this case. (*Id.*). The Court again disagrees.

i. The Court Failed to Consider the Interests of Iraq

KBR contends that the Court failed to consider the interests of Iraq. (*Id.*). However, in this Court's estimation, KBR conflates two separate issues: (1) the interests of the jurisdiction in the application of its law, which focuses on the policies underlying the legislation of the interested jurisdiction; with (2) the factual circumstances of the present case before the Court. On this first point, as the Court clearly noted in its earlier decision, KBR did not present the Court with any specific

policy reasons supporting the proffered Iraqi causation law in this case. *See Harris,* 796 F.Supp.2d at 657–58, 661, 2011 WL 2462486, at *11, *15. Instead, KBR only generally stated that Iraq has an inherent interest in applying its law to wrongful conduct that occurred within its borders.[9] *Id.* KBR's motion could have been denied on this basis alone because it presented the Court with no policy reason why the causation law at issue was developed, i.e., what was Iraq's interest in applying that particular law to the facts of this case. However, the Court assumed that the policy underlying the causation law was to protect the second negligent actor and analyzed the arguments with this policy in mind. *Id.* at 661, at *15. Without the Court's assumption, KBR's motion for the application of Iraqi law could have been summarily denied.

Turning to KBR's present arguments regarding the Court's consideration of Iraq's interests, the Court finds that all of KBR's contentions were previously presented in conjunction with their initial motion. (See Docket Nos. 220 at 8; 229 at 2). KBR's own filing demonstrates that its position as to these facts has already been considered. Specifically, KBR argues now that:

> [f]or example, the Opinion does not address the following facts demonstrating that it was not a "chance occurrence" that the facts underlying this case took place in Iraq: (1) the accident occurred in a hardstand building, LSF–1, that was constructed by Iraqis prior to the military invasion; (2) LSF–1 has continuously been owned by the Iraqi Government, including at the time of the incident; (3) LSF–1 was used by soldiers who were training Iraqi security forces, and these Iraqi security forces were

housed nearby, also within the LSF area; (4) LSF–1 was wired—without grounding—by Iraqis; and (5) LSF–1 will be returned to the Iraqi Government after the military withdraws from the RPC. *See Reply in Supp. of KBRSI's Mot. at 8; Suppl. Br. in Supp. of KBRSI's Mot. at 2.*

(Docket No. 242 at 8 (emphasis added)). The Court dedicated several pages of its Memorandum Opinion analyzing Iraq's interests in this case and a fair reading of the discussion demonstrates that all of these facts were considered. *Harris,* 796 F.Supp.2d at 654–63, 2011 WL 2462486, at *9–17. Indeed, the Court specifically noted, among other things, that "[b]ased on the prior arguments that have been presented to the Court in this case, *the Court understands that KBR's position in this litigation is that the Army was allegedly negligent in its decisions and actions related to housing soldiers in Iraqi buildings with known substandard electrical systems.* By advancing the causation law under the Iraqi Civil Code, KBR argues that if that law were applied, the Army's negligence would subsume its own negligence, if any." *Id.* at 661, at *15.

In addition, KBR has repeatedly interjected the first four facts it raises now into this litigation. (Docket No. 20, KBR's Brief in Support of Motion to Dismiss; Docket No. 35, KBR's Reply Brief; Docket No. 122, KBR's Supplemental Brief). However, before filing its motion for the application of Iraqi law, KBR has always taken the position that the United States' involvement at the RPC and LSF–1 far outweighed any interests of the Iraqis. *Id.* Indeed, KBR has continually argued that the United States controlled its conduct in relation to the LOGCAP III con-

---

**9.** The Court notes that Staff Sergeant Maseth's death occurred on an American military base which was controlled by Americans. *See* pp. 676–77, *infra.*

tract and KBR's provision of maintenance services to the military at the base. (*See, e.g.,* Docket No. 35 at 5 (noting "the all-encompassing envelope of military direction and control that surrounded KBRSI's maintenance efforts at RPC."). KBR has also raised numerous defenses to this litigation which arise under the United States' Constitution, statutes and Rules. (*See* Docket No. 217, KBR's Answer to Amended Complaint).[10] Also, the fifth fact, that LSF–1 will be returned to the Iraqi government after the military withdraws from Iraq, has yet to occur and has no real bearing on the activities on the base at the time of the incident underlying this lawsuit, January 2, 2008.

To reiterate, from this Court's view, the United States' interests in this litigation far outweigh the supposed interests of Iraq raised by KBR. While Iraq may have initially erected the buildings[11] in question during the reign of Sadam Hussein, the United States went to war against Iraq, and successfully invaded that country. As a result, Iraq's government was displaced by the Coalition Provisional Authority, an interim government which was run by a joint coalition of nations, headed by the United States. The United States then engaged KBR and other con-

tractors to provide certain services to the military during the occupation. In some cases, like in *Saleh,* the government contractors were engaged to provide military support and those contractors effectively acted as soldiers. *See* n. 2, *supra.* In others, as here, KBR provided routine electrical maintenance services with no real connection to the military operation, except, as KBR points out, for the fact that the services were provided on a military base on foreign soil. However, KBR's multi-million dollar "contracts with the Army, including the LOGCAP III base contract and Task Order 139 at issue here, make no reference to Iraqi law or Iraqi standards for construction, electrical work or plumbing services."[12] (*See e.g., LOGCAP III contract; LOGCAP III Contract, Statement of Work; Task Order 139* ); *see also Harris,* 618 F.Supp.2d at 403–415 (describing the contracts at issue). Iraq was not a party to the contracts between KBR and the military and Iraq had no control over the United States, KBR, or the contractual relationship between them. (*Id.*). In fact, pursuant to the contracts, KBR inspected the facilities and performed certain maintenance services at the base and at all times reported to the

---

**10.** Specifically, KBR has raised the following defenses: that this Court lacks subject matter jurisdiction over the case; that Plaintiffs' claims are barred by the political question and separation of powers doctrine; that Plaintiffs' claims are barred by the government contractor defense under *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); and Plaintiffs' claims are barred under the "combatant activities" exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(j). (Docket No. 217). The Court notes that the United States Court of Appeals for the Fourth Circuit recently addressed several of these defenses. *See e.g., Taylor v. Kellogg, Brown & Root Services, Inc.,* 658 F.3d 402, 2011 WL 4379353 (4th Cir. Sept. 21, 2011); *Al Shimari v. CACI Intern.,*

*Inc.,* 658 F.3d 413, 2011 WL 4382081 (4th Cir. Sept. 21, 2011); *Al–Quraishi v. L–3 Services, Inc.,* 657 F.3d 201, 2011 WL 4382115 (4th Cir. Sept. 21, 2011).

**11.** The Court will not belabor the point, as the Court has addressed it multiple times throughout this case, but Plaintiffs allege that KBR was both actively negligent in its maintenance of the facility and mishandling of the water pump and by failing to warn Staff Sergeant Maseth of the known electrical dangers found in its inspection. (Docket No. 209).

**12.** Of course, if KBR wanted Iraqi law to govern its contractual relationship with the United States, it could have negotiated its contracts to so provide. It did not.

military and the Defense Contract Management Agency—not to Iraq.

Further, this Court remains convinced that CPA Order 17 wholly undermines any tangential interest that Iraq may have had in its laws applying to government contractors such as KBR during the time in question. To this end, "Order 17 expressly provides that such contracts may be awarded in accordance with the laws of the United States. CPA Order 17, § 4.1. Order 17 also states that government contractors were: not subject to Iraqi laws or regulations in relation to the terms and conditions of their contracts; immune from Iraqi legal process; and that certain claims by third parties should be dealt with in accordance with the laws of the United States. CPA Order 17, §§ 4.2, 4.3, 18."[13] *Harris,* 796 F.Supp.2d at 663–65, 2011 WL 2462486, at *18. This conviction is particularly appropriate given that the third parties who were allegedly injured in this case by KBR were American (indeed an American serviceman and his parents) rather than Iraqis—who arguably may have expected Iraqi law to apply.

In sum, as the Court previously held, Iraq's negligible interests in this case are far outweighed by those of the United States and the controlling law of the United States will be applied, i.e., the relevant contract and tort law in one of the interested jurisdictions, Pennsylvania, Tennessee or Texas.

ii. The Court Gave Improper Weight to Plaintiffs' State of Residence and Failed to Appropriately Consider the Interests of Texas

KBR also argues that the Court improperly weighed the interests of Pennsylvania and Texas. (Docket No. 242). However,

the Court expressly held that it would revisit its conflicts of laws analysis as to the interested states, including Texas, Pennsylvania and Tennessee, at a later date. *See Harris,* 796 F.Supp.2d at 668, 2011 WL 2462486, at *21 ("Based on the foregoing, KBR's motion to apply Iraqi is denied. The Court's holding is limited to this issue and the Court expressly reserves ruling as to which of the interested states' laws apply to Plaintiffs' claims and KBR's defenses in this action going forward."). Therefore, KBR will be given the opportunity to further address its position as to the applicable laws. But, for clarity, the Court will briefly consider KBR's positions set forth in its motion for reconsideration.

As to the Court's consideration of Pennsylvania's interests, KBR contends that "[b]y looking to the place where the effects of an injury are felt, the Court gave improper weight to the factor of the Plaintiffs' state of residence, and thereby committed legal error. *See Blakesley v. Wolford,* 789 F.2d 236, 241 (3d Cir.1986) ('In all personal injury actions, the effects of an injury necessarily follow a plaintiff to his or her state of residence . . . looking to the place where the effects of an injury will be felt gives improper additional weight to the factor of the plaintiff's state of residence')." The Court disagrees that any such error was committed.

First, KBR relied on *Blakesley* in its initial briefing and the Court was not persuaded by this argument at the time. (*See* Docket No. 216). As a consequence, KBR again misuses a motion for reconsideration to re-litigate old matters. *See Miller,* 2011 WL 398408, at *1.

---

13. The Court again notes that the term "immunity" referred to here is that set forth in CPA Order 17 and the Court's reference to same does not in any way make KBR immune from this lawsuit. Moreover, it references Iraqi legal process while this action is pending here. *See discussion* at § IV(B)(1)(iii), *supra.*

Second, in this Court's opinion, *Blakesley* is distinguishable and not controlling in this case. *Blakesley* was a medical malpractice action. *Blakesley*, 789 F.2d at 236. The plaintiff in *Blakesley* was a Pennsylvania resident who was allegedly injured during a medical procedure performed on him in Texas, by a Texas doctor. *Id.* at 236–38. There, the Court of Appeals found error with the district court's reliance on the fact that the effects of the plaintiff's injuries followed him to Pennsylvania when he returned here. *Id.* In contrast, Staff Sergeant Maseth was killed instantly in Iraq and did not return to Pennsylvania. Indeed, KBR takes the position that Staff Sergeant Maseth was a resident of Tennessee rather than Pennsylvania at the time of his death. (*See* Docket Nos. 220; 226 at 3). So, Pennsylvania's interest in this case is not based on Staff Sergeant Maseth's former residency in the Commonwealth. Instead, Pennsylvania's interest is tied to the claims advanced by Staff Sergeant Maseth's estate which include claims asserted on behalf of his parents—the named plaintiffs—who are and always were in Pennsylvania. (Docket No. 209). Because they were always in Pennsylvania, their alleged injuries and resultant damages stemming from their wrongful death claims necessarily occur here. As a consequence, the location of his parents' injuries and damages was properly considered.

KBR further maintains that the Court failed to consider the interests of Texas regarding the causation issue. (Docket No. 242). Specifically, KBR argues that Texas law is not "pro-plaintiff" as the Court states in its Memorandum Opinion and that the Court's holding runs counter to Texas Civil Practice and Remedies Code

§ 33.004. (*Id.*). However, KBR again misunderstands the Court's ruling.[14]

To this end, KBR requested that three specific provisions of the Iraqi Civil Code should be applied to this case in its motion for the application of Iraqi law. (Docket Nos. 215, 216). With respect to the causation law proffered by KBR, the Court held the following:

> Under Iraqi law, a second negligent party will not be held responsible if "one of the causes is the result of the other" or, stated differently, "where there are two negligent acts, one built upon and the product of another, the second negligent act is 'drowned out' by the first, and is no longer considered a cause of harm." (*Id.* at ¶¶ 38–40). In his reports, Professor Hamoudi does not provide a precise opinion as to the policy underlying this principle of law. (*See* Docket No. 216-1). However, the logical reason for such a policy is to protect the second actor from liability where the harm to the plaintiff would have occurred without any action (or, presumably, inaction) by the second actor. Assuming this is the stated policy reason for the law; Iraqi law protects subsequent defendants from being subject to damages in such situations but also places the full burden to compensate the plaintiff for the harm caused on the initial negligent actor.

*Harris*, 796 F.Supp.2d at 657–58, 2011 WL 2462486, at *11 (footnote omitted). The only aspect of Texas law upon which the Court commented as "pro-plaintiff" was the "instant causation issue"—i.e., whether the Court should apply the Iraqi Civil Code section described above, that a second negligent actor has no liability. *Id.* at 662–63, at *17. None of the potentially interested states, Texas, Pennsylvania or

---

**14.** The Court recognizes that Texas has been one of the leading states in tort reform. *See* Tx. Civ. Prac. & Rem. Code §§ 33.001, *et seq.* But, such reform has not stretched to the extent that it could be considered in accord with the proffered Iraqi laws.

Tennessee, apply such a law. *Id.* In particular, the Court found that Texas employs a form of comparative negligence. *See id.* at 659, at *13 (citing Tx. Civ. Prac. & Rem. Code §§ 33.001, 33.003). As the Court recognized, the proffered Iraqi causation law is pro-defendant. If the Court would apply it (and the Court will not) it would curtail this litigation given KBR's argument that Staff Sergeant Maseth's death and injuries were caused by the United States' (or the Army's) actions and not its own. In this Court's opinion, all of the interested states have pro-plaintiff laws when compared to the cited Iraqi Civil Code provision. When read in the proper context, there is nothing erroneous about the Court's statement.

In addition, the law which is now cited by KBR, Texas Civil Practices & Remedies Code 33.004, was never raised in its initial briefing. (Docket Nos. 215, 216, 220, 229). By virtue of the Court's Order expressly reserving the parties' respective rights to litigate which of the states' laws apply, KBR will be given another opportunity to argue that Texas law, including Texas Civil Practices and Remedies Code § 33.004, should be applied at the appropriate time. However, reconsideration of the prior order is not warranted on this basis at this time.

### 3. The Court Relied on Erroneous Statements of Fact

KBR also maintains that the Court relied on an erroneous finding of fact in support of its decision, i.e., that "[t]*he evidence previously presented to the Court suggests that KBR fixed the actual water pump on more than one occasion and was aware that it had caused other soldiers to be shocked in the same shower where Staff Sergeant Maseth was killed. See Harris,* 618 F.Supp.2d at 413–14." *Harris,* 796 F.Supp.2d at 661, 2011 WL 2462486, at *15 (emphasis add-

ed). As recognized by the citation above, this statement is supported by the Court's Memorandum Opinion denying KBR's motion to dismiss, wherein the Court found that:

After the February 10, 2007 TI was completed, several service order requests were made to KBR regarding maintenance issues at the LSF–B 1 building. Some of these are relevant to the instant case. Specifically, Sergeant First Class Justin Hummer was housed in the same living quarters as Staff Sergeant Maseth at the RPC immediately prior to Staff Sergeant Maseth. (Docket No. 28–2 at 8). He lived at LSF–B1 from June 2007 to October 2007. (*Id.*). *SFC Hummer was shocked four to five times while using the shower in the same restroom in which the electrocution of Staff Sergeant Maseth occurred.* (*Id.*). *SFC Hummer testified that each time he was shocked, a service order request was filled out and presented to the Mayor's Cell.* (*Hummer Deposition 8/21/08, Defendant's Exhibit 3 to 8/27/08 Motion Hearing ("Hummer Deposition")* at 67). *KBR representatives responded to each of these requests and completed the maintenance services.* (*Id.* at 67–68). *During these maintenance calls, KBR inspected the water pump on the roof of LSF–B1, replaced a pressure switch on the water pump and replaced a heating coil on the water tank.* (Docket No. 28–2 at 9).FN15 *SFC Hummer also testified that after the work was completed, the shocking events subsided for some time.* (*Id.* at 68).

FN 15 Plaintiffs also maintain that KBR installed the water pump in question, relying on an email communication from Amber Wojnar, A SAC, MNF–1 Slayer to Plaintiffs. (Docket No. 121–8). That email states that *"[a] Filipino plumber*

*admitted to installing the pump on the roof during the previous KBR project in 2006. So, it was in fact conducted during KBR's time at RPC, and was not a bi-product of Iraqi engineering as previously alleged."* (*Id.*).

*Harris*, 618 F.Supp.2d at 413–14 (emphasis added). In opposition to the present motion, Plaintiffs advance additional evidence in support of the Court's statement of facts, including the Office of Inspector General, Department of Defense Report on Staff Sergeant Maseth's death, which stated that:

> We determined that **KBR installed the pump on the roof which contributed to the electrocution of SSG Maseth,** as well as adjacent water tanks during the first week of June 2006. We reached that determination based on KBR work order documents, interviews with four LSF–1 occupants and a KBR subcontracted plumber and photographs of LSF–1.

(Docket No. 244 at 7 (quoting *DOD–IG Report,* p. 3 (emphasis added by Plaintiffs)).

In light of the foregoing, the Court still believes that its recitation of the evidence is supported by the extensive record in this case. In any event, the Court only noted that the evidence "suggests" that KBR fixed the water pump and was aware of shocking incidents. *Harris,* 796 F.Supp.2d at 661, 2011 WL 2462486, at *15. The Court recognizes that KBR continues to deny these facts but KBR has offered no hard evidence which refutes the Court's earlier holding or the statement in the DOD–IG's report. (*See* Docket Nos. 242, 242–1, 242–2). Therefore, KBR has failed to demonstrate to this Court that it committed any factual errors and its motion for reconsideration is denied to the extent that it relies on such arguments.

### 4. KBR's Request to Hold Off Ruling on Motion Until After Discovery

KBR further notes that the Court should have held off ruling on the choice of law issue until after discovery. (Docket No. 242). In this Court's estimation, this claim is disingenuous and runs counter to its attorneys' multiple requests for early presentation and disposition of this motion, as detailed below.

Upon remand from the United States Court of Appeals for the Third Circuit, this Court ordered the parties to file a joint discovery plan. (Docket No. 195). In response to this Order, the parties filed separate plans and KBR stated in its plan that it "intends to file a motion regarding choice-of-law at an early stage in the discovery period so that, to the extent the applicable law demonstrates that discovery regarding the merits of particular claims asserted by Plaintiffs is warranted, the parties can tailor their discovery efforts as appropriate." (Docket No. 197 at ¶ 13). Regarding this request, the Court and counsel engaged in the following exchange during the second session of the case management conference on November 23, 2010:

> MR. LUCIANA: We did raise in our Rule 26 report, Your Honor, that we anticipate a motion relating to the applicable law.
>
> THE COURT: Right. We've seen that.
>
> MR. LUCIANA: The way we understand the conflict of law principles, it's very possible that Iraqi law applies here. So, we would like to brief the Court on that point.
>
> THE COURT: Okay. So, when are you going to do that?
>
> MR. LUCIANA: I would have to confer with my team. *But sooner rather than later.*
>
> THE COURT: Okay.

MR. LUCIANA: So, if you—we would anticipate or we could, as a goal, shoot for sixty days for that which would coincide with the written discovery period. THE COURT: Okay. And then, Mr. Cavanaugh and company, how long is it going to take you to respond to that? Thirty days? Sixty days? MR. CAVANAUGH: Thirty's fine. THE COURT: Once you've each briefed the issue, if either one of you want argument, it's as simple as e-mailing Mr. Kravetz or Mr. Galovich and we'll get you in to argue those. . . .

(Docket No. 200 at 38–39 (emphasis added)).

Subsequent to the conference, the Court ordered that "any motion by Defendant regarding the choice of law issue shall be filed by 1/28/11 and any response to same by Plaintiffs shall be filed by 2/28/11. Further briefing will be permitted with leave of Court only and oral argument will be scheduled upon the request of the parties." (Docket No. 198). KBR then requested a continuance of said deadline, which the Court granted, and filed its motion, supporting brief and expert affidavit on February 4, 2011. (Docket No. 215, 216). Plaintiffs responded to KBR's motion and KBR then filed a reply brief and a supplemental expert affidavit. (Docket No. 221). Oral argument was held at KBR's request on April 5, 2011. (Docket Nos. 223, 226). At the end of the April 5, 2011 hearing, the Court advised that: "[o]nce again, this presents a very interesting issue. As I said, we've already spent substantial time in looking at this. Once we get the briefing, I would hope that we would be able to render a decision in 30 days or less." (Docket No. 226 at 71–72). No objections were raised to the Court's self-imposed deadline.

Supplemental briefing was submitted by the parties on April 27, 2011 and May 5,

2011, respectively. (Docket No. 229, 231). The Court issued its Opinion on June 17, 2011, approximately 45 days after the matter was fully briefed.

In sum, KBR's request to hold off resolution of its motion for the application of Iraqi law flies in the face of the procedural history of the present motion and the fact that the disposition of the motion was expedited pursuant to KBR's request. Therefore, to the extent that KBR seeks reconsideration of the timing of the Court's decision, said motion is likewise denied.

## V. CONCLUSION

Based on the foregoing, KBR's motion for reconsideration [241] is DENIED. The Court's prior ruling that Iraqi law will not be applied to this litigation stands. An appropriate Order follows.